UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STATE OF TEXAS, et al.,          *
                                 *
    Plaintiffs,              *
                                 *
    v.                       *   Case No. 4:20-cv-02021
                                 *
RISING EAGLE CAPITAL             *
GROUP, LLC, et al.,              *
                                 *
    Defendants.              *


IN-PERSON, VIDEOTAPED, AND

VIDEOCONFERENCED ORAL DEPOSITION OF

JOHN C. SPILLER, II

Wednesday, March 2, 2022

     IN-PERSON, VIDEOTAPED, AND VIDEOCONFERENCED

ORAL DEPOSITION OF JOHN C. SPILLER, II, produced as a

witness at the instance of the Plaintiff, the State of

Texas, and duly sworn, was taken in the above-styled

and numbered cause on Wednesday, March 2, 2022, from

10:37 a.m. to 5:41 p.m., before Debbie D. Cunningham,

CSR, in and for the State of Texas, reported via Machine

Shorthand at the offices of the Texas Attorney General,

300 W. 15th Street, 9th Floor, Austin, Texas 78701,

pursuant to the Federal Rules of Civil Procedure.

--ooOoo--

```
 1                        APPEARANCES

 2

 3   FOR PLAINTIFF STATE OF TEXAS:

 4        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
          Consumer Protection Division
 5        300 W. 15th Street, 9th Floor
          Austin, Texas  78701
 6        (T) 512.463.2100
                By:  Patrick Abernethy, Esq.   (In Person)
 7                   Patrick.abernethy@oag.texas.gov
                                AND
 8                   Chanele Reyes, Esq.       (In Person)

 9
     FOR PLAINTIFF STATE OF ARKANSAS:
10
          OFFICE OF THE ARKANSAS ATTORNEY GENERAL
11        323 Center Street, Suite 200
          Little Rock, Arkansas  72201
12        (T) 501.682.7506 (McCoy)
          (T) 501.682.8062 (Johnson)
13                By:  David McCoy, Esq.        (Via Zoom)
                     David.McCoy@ArkansasAG.gov
14                              AND
                     Peggy Johnson, Esq.       (Via Zoom)
15                   Peggy.Johnson@ArkansasAG.gov

16
     FOR PLAINTIFF STATE OF INDIANA:
17
          OFFICE OF THE INDIANA ATTORNEY GENERAL
18        302 West Washington Street
          IGCS - 5th Floor
19        Indianapolis, Indiana 46204
          (T) 317.232.6294 (Swetnam)
20        (T) 317.234.1912 (Yeoman)
                By:  Douglas S. Swetnam, Esq.  (Via Zoom)
21                   douglas.swetnam@atg.in.gov
                                AND
22                   Joseph D. Yeoman, Esq.    (Via Zoom)
                     Joseph.Yeoman@atg.in.gov
23                              AND
                     Casey Klippel, Esq.       (Via Zoom)
24                   Casey.Klippel@atg.in.gov

25
```

3

```
1   FOR PLAINTIFF STATE OF MICHIGAN:

2        MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
         Corporate Oversight Division
3        P.O. Box 30736
         Lansing, Michigan  48909
4        (T) 517.335.7632
              By:  Kathy P. Fitzgerald, Esq. (Via Zoom)
5                  fitzgeraldk@michigan.gov

6

7   FOR PLAINTIFF STATE OF MISSOURI:

8        OFFICE OF THE MISSOURI ATTORNEY GENERAL
         P.O. Box 861
9        St. Louis, Missouri  63188
         (T) 314.340.7961
10            By:  Michelle L. Hinkl, Esq.  (Via Zoom)
                   Michelle.Hinkl@ago.mo.gov
11

12
    FOR PLAINTIFF STATE OF NORTH CAROLINA:
13
         NORTH CAROLINA DEPARTMENT OF JUSTICE
14       Consumer Protection Division
         P.O. Box 629
15       Raleigh, North Carolina  27602
         (T) 919.716.6000
16            By:  Tracy Nayer, Esq.       (Via Zoom)
                   tnayer@ncdoj.gov
17

18
    FOR PLAINTIFF STATE OF NORTH DAKOTA:
19
         OFFICE OF ATTORNEY GENERAL OF NORTH DAKOTA
20       Consumer Protection & Antitrust Division
         1720 Burlington Drive, Ste. C
21       Bismarck, North Dakota  58504
         (T) 701.328.5570
22            By:  Parrell D. Grossman, Esq. (Via Zoom)
                   pgrossman@nd.gov
23                         AND
                   BRIAN M. CARD, Esq.      (Via Zoom)
24                 bmcard@nd.gov

25
```

4

```
 1   FOR PLAINTIFF STATE OF OHIO:

 2        OHIO ATTORNEY GENERAL'S OFFICE
          Consumer Protection Section
 3        30 E. Broad Street, 14th Floor
          Columbus, Ohio  43215
 4        (T) 614.752.4730 (Leahy)
          (T) 614.728.1172 (Garrison)
 5            By:  Erin B. Leahy, Esq.     (Via Zoom)
                   Erin.Leahy@OhioAGO.gov
 6                       AND
                   W. TRAVIS GARRISON, Esq.  (Via Zoom)
 7                   Travis.Garrison@OhioAGO.gov

 8

 9   FOR DEFENDANT SCOTT SHAPIRO:

10        BURNS & LEVINSON, LLP
          125 High Street
11        Boston, Massachusetts  02110
          (T) 617.345.3000
12            By:  Shepard Davidson, Esq.   (In person)
                   sdavidson@burnslev.com
13

14
     FOR DEFENDANTS MICHAEL T. SMITH, JR.
15   AND HEALTH ADVISORS OF AMERICA, INC.:

16        THE FRANQUI FIRM
          1451 W. Cypress Creek Rd., Ste. 300
17        Ft. Lauderdale, Florida  33309
          (T) 954.947.3023
18            By:  Anthony G. Franqui, Esq.  (Via Zoom)
                   tony@thefranquifirm.com
19

20
     FOR DEFENDANT JOHN C. SPILLER, II,        (PRO SE)
21   AND RISING EAGLE CAPITAL GROUP, LLC:

22        JOHN C. SPILLER, II                (In person)
          9022 N. Ferndale Place Drive
23        Houston, Texas  77064
              rpgleads@gmail.com
24

25
```

5

```
 1   ALSO PRESENT:    Scott Shapiro        (In person)
                      Maggie Casanova      (In person)
 2                    Sgt. Joey Diaz       (In person)
                      Sgt. Dan Smith       (In person)
 3                    Leann Moch           (Via Zoom)
                      John Hathaway        (Via Zoom)
 4                    John Isaacs          (Via Zoom)

 5
     VIDEOGRAPHER:    Bill Burns           (In person)
 6

 7   ZOOM TECH:       Brian Christopher    (Via Zoom)

 8
                         --ooOoo--
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  we were given the URL location where we can put

2  the number in to see if it came back or who it

3  came back as the owner of it; was it AT&T,

4  Verizon, T-Mobile.  Those are the three we're

5  not allowed to use.  We're only allowed to use

6  other ones that were off-brand ones.

7        So that's when [sic] Jakob was

8  doing for us in the beginning; but, anyways, he

9  would put those numbers in.  And we were

10  changing out the numbers every time they'd get

11  burned.  We would find out when they get burned

12  because we would call our own phone number from

13  our own Switch; and it would dial the number

14  and if it came up "Scam Likely," then we'd know

15  the number was burned.  So we would end up

16  using those 250 million DIDs that we received

17  that were on the -- registered as no ones as

18  our own and using those to dial from.

19        Q.   (BY MR. ABERNETHY)  And just to

20  clarify, can you define what a DID is?

21        A.   A DID is an ANI or it's also

22  considered an NPA-NXX, which is -- the first

23  part is the area code.  The second part is the

24  NPA, which is the part that determines where

25  you're at in the United States -- you could be

1  in Austin, Texas; you could be -- depending on

2  those next three numbers.

3       Q.   Uh-huh.

4       A.   And then the last four are just

5  random.  But a DID is an ANI.

6       Q.   Can you define ANI for me, as well,

7  then?

8       A.   It's a phone number.

9       Q.   Okay.  And when you say you burned

10 numbers, what do you mean by that?

11      A.   They would pop up as "Scam Likely."

12 Anytime they come up as "Scam Likely," you have

13 to change them out so that you're still able to

14 dial and still get people to answer the phone.

15      Q.   What would make them show up as "Scam

16 Likely"?

17      A.   Too many dials.  In the beginning

18 Verizon, AT&T in 2017 weren't that good on

19 "Scam Likely."  On those apps that they have

20 now, they didn't have any of those

21 configurations in the past.  Usually what would

22 happen would be you would end up calling 10,000

23 numbers on one number; and then out of all

24 those people, some of them would either report

25 it to the FTC or the FCC.  And once they report

1   definition of spoofing, did you -- did any

2   clients ask you to do that?

3      A.   No.

4      Q.   Did any clients know that you were

5   doing that?

6            MR. FRANQUI:  Object to the

7   form.

8      A.   I don't -- I don't remember.

9      Q.   (BY MR. ABERNETHY)  Did you ever

10  communicate to Health Advisors that Rising

11  Eagle was spoofing?

12            DEFENSE COUNSEL:  Objection.

13     A.   I never said that we were spoofing

14  because back in those days, we were -- like I

15  said, given 250 million numbers that were ANIs

16  that were not listed to any user.  Those are

17  the ANIs we would be putting into our Switch to

18  make it work, to make sure that the numbers

19  would not come up "Scam Likely" or "fraud

20  likely."

21     Q.   And where did you get those 250

22  million?

23     A.   From the gentleman that owned Globex,

24  Mohammed.

25     Q.   Do you know his full name?

1       A.    Mohammed Souheil.

2       Q.    And what was -- what did Globex do?

3       A.    They were -- they bought R Squared.

4  R Squared was my Number 1 vendor back in the

5  day when I started.

6       Q.    So did you buy those from Globex?

7       A.    Huh-uh.  He gave them to me.

8       Q.    Why did he give them to you?

9       A.    So that I'm able to dial freely.

10      Q.    And how did you know Mohammed

11 Souheil?

12      A.    I met him through Ryan, the owner of

13 R Squared.  He introduced me to him.

14      Q.    Okay.  Can you tell me what R Squared

15 is?

16      A.    A telecom company.

17      Q.    And just to clarify again, did you

18 ever communicate to Scott Shapiro that Rising

19 Eagle was spoofing at this time?

20            DEFENSE COUNSEL:  Objection.

21      A.    No, I never communicated to him that

22 we were spoofing.  Again, in the past, we

23 didn't notice what was going on with the DIDs;

24 but sometimes we would call his number.

25 Sometimes we'd call Michael's number on the

```
 1       A.   That was the only reason.

 2       Q.   Whose idea was that?

 3       A.   Mine.

 4       Q.   Okay.  Did his role with the company

 5   change with that?

 6       A.   Huh-uh.

 7       Q.   At that point what were his

 8   day-to-day duties?

 9       A.   Running my dialer.

10       Q.   Okay.  Can you take us through a

11   typical day of what that means?

12       A.   He would wake up and start the dialer

13   by 7:00 a.m.  He wouldn't shut the dialer off

14   until about 8:00 or 9:00, whenever the room

15   stops.  We'd get access to see the room.  They

16   would give us their VICIdial login.  We would

17   have access to see the room and what they're

18   doing in production, see how many calls go into

19   sales, how many long calls they had, how many

20   calls are in hot pink; or hot purple means that

21   they've been on calls longer than 20 minutes --

22   or longer than 15 minutes.

23       Q.   And how much were you paying Jakob at

24   this time?

25       A.   $2,000 a week, 1,500 to $2,000 a
```

```
 1  week.

 2       Q.   So was that 30,000-to-40,000 number

 3  just to help with getting the house?

 4       A.   Yes, that's it.

 5       Q.   Okay.  Do you have any idea what you

 6  paid him annually?

 7       A.   No.

 8       Q.   And what was your day to day looking

 9  like at this time?

10       A.   Still helping him run the dialer for

11  the most part.  In 2018 I got in trouble.  I

12  got arrested in Houston, Texas for evading

13  arrest in a motor vehicle.  So I was dealing

14  with a court case that took up a lot of my

15  time.  And, also, in 2018 I pled guilty for my

16  fourth DWI in the state of Texas, here in

17  Houston -- or here in Austin, Texas.  So I was

18  also dealing with that as well.  So there was a

19  lot on my plate.  So even though I was helping

20  him manage my business, my priorities were

21  pretty cram packed during those times.

22       Q.   Okay.  And -- but his day was, you

23  said, 7:00  to 8:00 or 9:00.  Is that central

24  time?

25       A.   Uh-huh.
```

```
 1  drink anymore.  So I decided to -- I switched

 2  to drugs.  I was using drugs on a regular

 3  basis.

 4       Q.   And then back to Brian, so did he

 5  work with Rising Eagle?

 6       A.   No.

 7       Q.   He didn't work with Rising Eagle or

 8  for Rising Eagle?

 9       A.   Huh-uh.

10       Q.   Did he have any relationship with

11  Rising Eagle or --

12       A.   Huh-uh -- well, I believe at one

13  point he did run a call center for me.

14       Q.   For what?

15       A.   Senior medical alert devices.

16       Q.   And what is that?

17       A.   Devices that senior citizens wear

18  around their neck in case they get lost or they

19  need help or they fall or break their leg or

20  break their arm, break their back, fall down.

21  They can push it and it sends an emergency

22  vehicle out to their residence or wherever

23  they're located at.

24       Q.   And that company was not related to

25  Rising Eagle?
```

1           So did she -- you said she

2  didn't do your taxes on that first look.  Did

3  she ever do taxes for you?

4       A.   She did finish my taxes, one of my

5  tax returns in 2018; but she -- she had told me

6  that -- because I had basically stopped her

7  process of completing them because she was

8  asking me too many questions.  I wasn't willing

9  to get into it with her.  And she just told me

10 she wasn't going to do any of my taxes or my

11 tax work anymore.

12      Q.   And do you mean your personal taxes

13 or Rising Eagle's taxes?

14      A.   Rising Eagle's taxes.

15      Q.   Did you ever pay her or did Rising

16 Eagle ever pay her for these tax services?

17      A.   Yeah.  I -- I don't have a clue on

18 how much, but I do remember -- because back in

19 those days I only had that as my personal

20 account.  So I believe I paid her from that

21 account to pay for bills, pay for the house.

22      Q.   Do you remember if Rising Eagle ever

23 paid her a hundred thousand dollars in a single

24 check?

25      A.   Yes.

John Spiller - 3/2/2022

55

```
 1        Q.   Do you remember what that payment was

 2   for?

 3        A.   Yes.  That was my -- I paid that to

 4   myself.  That was my earned income.

 5        Q.   Why did you write the check to her?

 6        A.   I put it as a cashier's check because

 7   I didn't think the bank would give me hundred

 8   thousand dollars in cash and allow me to

 9   transfer that into my own personal account.

10        Q.   So you used that to pay yourself

11   income?

12        A.   Uh-huh, and we had a joint account.

13   That's the thing she deposited that money into

14   was the joint account.

15        Q.   And when you say Rising Eagle paid

16   for other personal expenses, what do you mean

17   by that?

18        A.   Paid for the house utilities, paid

19   for -- paid for gas, paid for food, paid for

20   outings, paid for -- everything you can think

21   of, it paid for it.  I mean, that was my

22   personal checking account as well as -- as well

23   as the business.  I didn't know about piercing

24   the corporate veil.  I was a novice at owning

25   businesses.  I didn't know what the hell I was
```

1  doing.

2      Q.   Can you tell me what you mean when

3  you say "piercing the corporate veil," what

4  your understanding of it is?

5      A.   I commingled funds that were supposed

6  to stay within Rising Eagle Capital.  I used

7  them for my personal use.

8      Q.   Did you ever pay anything related to

9  your legal expenses, personal legal expenses?

10     A.   Uh-huh.

11     Q.   Your criminal legal expenses?

12     A.   Yeah.

13     Q.   All right.  So did Rising Eagle have

14  its own call centers?

15     A.   It only had one call center, and it

16  was under the company Senior Medical Alert.

17     Q.   And tell me where that was located.

18     A.   Houston, Texas.

19     Q.   Okay.  And do you know where or

20  remember where in Houston, Texas?

21     A.   Off of 610 --

22     Q.   And that --

23     A.   -- North Loop West.

24     Q.   And that's the call center that Brian

25  Failla worked at?

1      A.   Huh-uh, huh-uh.

2           MS. REYES:  "Yes" or "no."

3      Q    (BY MR. ABERNETHY)  "Yes" or "no," please.

4      A.   No.

5      Q.   Did Rising Eagle itself sell any

6  goods or services?

7      A.   No.  The only thing it sold was

8  calls.

9      Q.   And what does that mean when you say

10  you sold calls?

11     A.   Calls are opted in -- or I wouldn't

12  even -- once a client is called, they're played

13  a recording.  In the recording they can push

14  one or two, two to be put on our do-not-call

15  list or press one to speak with a live agent.

16  When they push one, they become a live lead.

17  That lead gets transferred to the call center.

18  The call center picks up the phone and sells

19  them.  Those are calls.

20     Q.   Okay.  And when you say "client,"

21  what do you mean by that?

22     A.   Call centers.

23     Q.   Okay.

24     A.   I don't mean to make your job harder.

25     Q.   So do you know Health Advisors of

1    America?

2          A.    Yes.

3          Q.    And how do you know them?

4          A.    They were my client.

5          Q.    And can you tell me again what you

6    mean by that, what that relationship was?

7          A.    They were -- Michael Smith approached

8    me first in 2017 -- or it might have been

9    sooner -- told me he had -- it might have been

10   the end of 2016, to be honest with you.

11   Irregardless, he approached me and told me he

12   needed called; and he told me how Matt Jones

13   was generating calls.

14                So I started looking into it.  I

15   started researching it, found out a way to

16   generate a massive amount of leads as long as I

17   had servers.  I found a company out of the

18   Philippines that were able to sell me servers

19   that were designed for robodialing or also

20   known as press-1 dialing; and I was able to

21   build -- in the first year I was able to build

22   three clusters.  Three clusters means -- comes

23   with three servers, each server producing

24   150,000 calls per minute.

25         Q.    And how do you know Michael Smith, or

1    A.   Just to go there and see how they're

2  doing, build up some rapport with them, see how

3  their call centers are working, to talk about

4  compensation, see if they can increase -- in

5  the beginning they had us at a 250-dollar CBA;

6  and we wanted a little bit more because our

7  costs of us running the robodialer was costing

8  us around 15,000 a month, not including the

9  telecom minutes that was costing us around

10  3,000 to $5,000 a week, not including Jakob's

11  costs.  The cost of maintaining life in general

12  was adding up, so we wanted more money.  So

13  that was a couple of the reasons we went to

14  Florida was to talk about them getting us paid

15  a little bit more.

16    Q.   And since you were served with the

17  lawsuit, have you spoken with Mike Smith?

18    A.   Huh-uh.

19    Q.   And since --

20    A.   No.

21    Q.   And since you've been served, you

22  have not spoken with Scott Shapiro?

23    A.   No.

24    Q.   All right.  So while you were CEO of

25  Rising Eagle, did you go to jail?

1      A.   Yes.

2      Q.   And when was this?

3      A.   The end of 2018, the beginning of

4  2019, November the 26th, 27th.

5      Q.   Of 2018?

6      A.   Uh-huh.

7      Q.   And then, do you know when in 2019

8  when you got out?

9      A.   March.

10     Q.   Did Rising Eagle continue operating

11 while you were in jail?

12     A.   Yes, Jakob did continue operating it.

13     Q.   Was Jakob -- well, what was -- what

14 was his role during that time?

15     A.   I was in jail.  I would call him and

16 see how the dialers were holding up.  I'd call

17 him to see how much money Scott and Mike were

18 sending.  That's basically what I was doing.

19 Jakob would start the dialer, run the dialer,

20 manage everything.

21     Q.   How often did you talk to Jakob?

22     A.   Every day in the morning.  I'd try to

23 talk to him in the morning, and then we'd talk

24 again in the evening.

25     Q.   By telephone every time?

1          MR. ABERNETHY:  Thanks, Joe.

2          (Exhibit 8.1 and Exhibit 8.2

3  audio clips playing as follows:

4          MR. SHAPIRO:  Are you there?

5          MR. MEARS:  You're on.

6          MR. SHAPIRO:  Are you there?

7          MR. SPILLER:  Yeah, I'm here.

8  Okay.  Go ahead.

9          MR. SHAPIRO:  Yeah, I just

10  [inaudible] a little bit; but...

11          MR. SPILLER:  Okay.  Go ahead.

12          MR. SHAPIRO:  Can you hear me?

13          MR. SPILLER:  Yeah, I can hear

14  you.  Go ahead.

15          MR. SHAPIRO:  Yeah, yeah.  So, I

16  mean, they only got 1100 in Room 2; and my room

17  is only getting, like, some 11,000, twelve,

18  maybe thirteen sometimes.  I mean, I thought I

19  was going to get a lot more calls.

20          Obviously, it's a little

21  different now; but [inaudible] all the time.  I

22  told Jakob I'm having 30 to 40 people waiting

23  at one time.  At all times -- like, there's

24  never a time that everybody's on the phone.

25  Never.  You can ask Jakob.  Never.  Like,

1  never.

2           Even when I send him new leads,

3  it's still never like that.  That's why I think

4  the cluster is not enough [inaudible.]  I don't

5  know what the problem is, but you do.  I guess

6  is what I'm asking.

7           MR. SPILLER:  Okay.  Well, then

8  -- well, I do know -- I do know for a fact that

9  they're on a cluster, that they're already on

10 their own cluster.  They're on -- they're on

11 Cluster 48.  It used to be a cluster that we

12 used to use, right?  So we cut it in half, and

13 we gave it half to them so they could use it.

14           So what we can do is, is we can

15 retake some of the leads that they sent us; and

16 we can put them in -- we can -- we can -- we

17 can add some more -- we can add some more clout

18 to their -- to their server.

19           MR. SHAPIRO:  Yeah, because 1100

20 a day is not enough for 30 people.  It's not.

21           MR. SPILLER:  No, 1100 is not

22 enough for 30 people.

23           MR. SHAPIRO:  Yeah, and then

24 mine is the same thing.  I'm asking -- I'm

25 sending leads almost every day, and nothing.  I

1   still have 30 people, 40 people waiting at a

2   time; and that's not done, never, like, when

3   you were there.  I know he knows what he's

4   doing, but it -- something's wrong.  That's why

5   I need you need to fix it.  Something's going

6   on that I'm not getting enough calls.

7                    MR. SPILLER:  Yes, sir.  Well,

8   then --

9                    MR. SHAPIRO:  Yeah.

10                    MR. SPILLER:  -- ultimately what

11   it comes down to is two things:  It's the

12   leads; and then it's also the control of the

13   dialer, the dialer dialing out.  And, hey, hey,

14   hey, and that's -- and that's something else I

15   need to tell you.  You don't have to worry

16   about anything about your name being released

17   because of robodialing.  Your name is a hundred

18   percent protected on the back end because when

19   I switched you over to R Squared, I protected

20   your name of your business.

21                    MR. SHAPIRO:  I don't -- I don't

22   know what you're talking about, robodialing.

23                    MR. SPILLER:  Okay.

24                    MR. SHAPIRO:  I don't know what

25   you mean.  Yeah, I don't know what you mean.

```
 1                MR. SPILLER:  Okay.

 2                MR. SHAPIRO:  I don't know what

 3  that is.  I don't know what that is.

 4                MR. SPILLER:  Okay.

 5                MR. SHAPIRO:  [Inaudible.]  All

 6  right.  Can you fix it or get with Jakob to fix

 7  it?

 8                MR. SPILLER:  Yes, sir.  Yes,

 9  sir.  I'll get with Jakob to fix it.

10                MR. SHAPIRO:  Yeah, the AI calls

11  need to be fixed.  They're not getting enough

12  calls.

13                MR. SPILLER:  Okay.  Sounds

14  good.  Sounds good.

15                MR. SHAPIRO:  Okay.  Take care.

16  Bye-bye.

17                MR. SPILLER:  Thank you.

18  Bye-bye.

19                Hey, hey, so they have 40 agents

20  waiting right now?

21                MR. MEARS:  No.

22                MR. SPILLER:  How many agents --

23                MR. MEARS:  They're fluxing --

24                MR. SPILLER:  -- do they have

25  waiting?
```

```
 1              MR. MEARS:  They're fluxing
 2  between 15 and 30 right now.
 3              MR. SPILLER:  And why do they
 4  flux between 15 to 30?
 5              MR. MEARS:  I think one file is
 6  full, but it also -- the one file's full, so
 7  wait; but, also, it has six calls at the same
 8  time.
 9              It just -- oh, well, now, it
10  [inaudible].  It just turned 10:00 o'clock
11  their time.  He put from -- the first hour's a
12  little better than the second hour, a little
13  bit.  Right now, they're at 20, 19.
14              (Buzzer sound.)
15              MR. MEARS:  Scott's calling me
16  now.
17              MR. SPILLER:  Answer it.
18              MR. MEARS:  Hi, Scott.  I'm
19  still talking to John.
20              MR. SHAPIRO:  Say it again --
21  you're still on with him?
22              MR. MEARS:  Yeah.
23              MR. SHAPIRO:  Hey, put me in --
24  put me on.
25              MR. MEARS:  You're -- okay.
```

```
 1   You're on speaker, too.
 2               MR. SHAPIRO:  John, this is the
 3   thing:  I don't want to do robocalls; and I
 4   don't want to end up doing robocalls and
 5   press-ones.  Doing any calls --
 6               MR. SPILLER:  No, sir.  No, sir.
 7               (Simultaneous speakers.)
 8               MR. SPILLER:  Yes, sir.  Yes,
 9   sir.  Yes, sir.  Yes, sir.  Yes, sir.
10               MR. SHAPIRO:  Okay.
11               MR. SPILLER:  The only thing
12   we're using is AI calls.
13               MR. SHAPIRO:  Okay.  Just make
14   sure it's not robocalls and -- and -- and
15   press-ones.  I don't want to do that.
16               MR. SPILLER:  Yes, sir.
17               MR. SHAPIRO:  So I called
18   because I didn't understand what you meant.
19               MR. SPILLER:  Yes, sir, I got
20   you.  No worries.
21               MR. SHAPIRO:  All right.  So how
22   you doing, John?
23               MR. SPILLER:  Feeling good.
24   Yeah, feeling good, man.  Feeling good.
25               MR. SHAPIRO:  All right.  Call
```

```
 1   me if you guys need me.

 2              John, see if you can figure out

 3   what the problem is [inaudible.]

 4              MR. SPILLER:  Yes, sir.

 5              Hey, Scott, hey, Scott, hey,

 6   Scott?

 7              MR. SHAPIRO:  Yes.

 8              MR. SPILLER:  Since we -- since

 9   we put you on the -- since we're putting you on

10   your own server to increase your dial speed,

11   we're going to -- we're going to ask that y'all

12   guys pay the 225 moving forward today.  Okay?

13              MR. SHAPIRO:  That's fine.  No

14   problem.

15              MR. SPILLER:  Okay.  Thank you.

16              MR. SHAPIRO:  Okay.  All right,

17   man.  Bye.

18              MR. SPILLER:  Bye-bye.

19              Okay.  So [inaudible] are you

20   there?

21              MR. MEARS:  Yeah.)

22              (Audio playback ended.)

23       Q.   (BY MR. ABERNETHY)  All right.  Can

24   you identify what you just heard?

25       A.   A conversation between myself, Scott
```

1   Shapiro, and Jakob Mears.

2        Q.   Do you recall that conversation?

3        A.   I do not.  Like I'm saying, these

4   conversations happened three years ago when I

5   was -- I mean, I was a hundred percent sober,

6   that's for sure.  I just don't remember a lot

7   of the conversations that I had during those

8   times.

9        Q.   Then, to your understanding, what did

10  it mean when it was said that 30 to 40 people

11  were waiting in the room?

12       A.   They have agents -- agents that are

13  waiting for phone calls.

14       Q.   And what does that mean, they're

15  waiting for phone calls?

16       A.   Either the data was destroyed and

17  Scott needed to send us another file or Michael

18  needed to send us another file or it was the

19  person running the dialer that wasn't loading

20  -- or that wasn't assessing which file to load

21  in which campaign or in which cluster.

22            Different clusters produced a

23  higher number of calls, a higher number of

24  volume, a higher number of calls in general.

25  So 68 -- Cluster 68, Cluster 60 -- so my first

1  that we're dialing.

2       Q.    And do you know who sent Rising Eagle

3  leads every day?

4       A.    Scott and Mike Shapiro -- Scott

5  Shapiro and Michael Smith.

6       Q.    And how do you know that during that

7  time?

8       A.    Because Jakob would tell me.  Jakob

9  wouldn't be able to run the business -- well,

10  we had a stockpile of leads as well.  We had a

11  stockpile of leads that Scott and Mike sent us

12  since 2018 or 2017.  We were always saving the

13  leads that they would send us; and I would have

14  Jakob try to mark on there which leads were

15  good, which leads were not, which leads gave us

16  the best returns, what leads didn't.

17       Q.    Why were you stockpiling leads at

18  that time?

19       A.    Because we were dialing millions of

20  people a day.  We had to make sure we had the

21  data because -- because at some point we were

22  dialing more than 3 million numbers in a day

23  and Scott and Mike would only send us 3 million

24  numbers in a day; sometimes they'd only send us

25  1.5 million.

1   calls.

2        Q.   (BY MR. ABERNETHY)  Do you have

3   access to the e-mail address that Mikel Quinn

4   would receive tracebacks on?

5        A.   No.

6        Q.   He would just forward them to you?

7        A.   Uh-huh.

8             MS. REYES:  "Yes" or "no"?

9             THE WITNESS:  Yes.

10       Q.   (BY MR. ABERNETHY)  Did you ever have

11  access to that account?

12       A.   No.

13            MR. ABERNETHY:  Can we take a

14  five-minute break?

15            THE VIDEOGRAPHER:  All right.

16  We'll go off at 2:33.

17            (Off the record from 2:33 to 2:44 p.m.)

18            THE VIDEOGRAPHER:  We're back on

19  the record.  It's 2:44.

20       Q    (BY MR. ABERNETHY)  All right.  Do you know if

21  Health Advisors ever used a VICIdialer?

22       A.   Yes.

23       Q.   And how do you know that?

24       A.   They gave us access to it.

25       Q.   Who is "us"?

John Spiller - 3/2/2022

164

1      A.   Gave Rising Eagle Capital access to

2   it, myself and Jakob Mears, access to their

3   VICIdial so we can see how many calls are

4   coming from us and we can see -- because back

5   in the day we were the only vendor they used.

6   I believe they were using another vendor as

7   well; but then, I want to say it was around

8   month three I blew that vendor out of the water

9   by the amount of calls I was able to send them.

10      Q.   So did you personally have a login?

11      A.   The business had a login, not me

12   personally.  Rising Eagle Capital did.

13      Q.   Was that the only login that Rising

14   Eagle had?

15      A.   Uh-huh.  Yeah, we shared it.

16      Q.   Did Jakob have access to that login?

17      A.   Yes, he did.

18      Q.   Did JSquared have a login?

19      A.   No.  We used the same login --

20      Q.   Okay.

21      A.   -- that was created for Rising Eagle

22   Capital.

23      Q.   And could two people be logged in at

24   the same time with the same login?

25      A.   I believe so.

 1        A.    I think in the beginning -- I just

 2   can't say.   I just can't say because, honestly,

 3   in the beginning, we were barely sending them

 4   any calls.   It wasn't until sometime in the

 5   mid- -- in the middle of it -- potentially, you

 6   know, I would say in the beginning probably

 7   around 250,000 calls to a million calls.

 8        Q.    What would you say that would be as a

 9   percentage of Rising Eagle's total calls?

10        A.    That was all of Rising Eagle's total

11   calls.

12        Q.    Did it fluctuate?

13        A.    Uh-huh.

14              MS. REYES:   "Yes" or "no"?

15        A.    Depending on the data, yes.

16   Depending on the data and also on the DIDs that

17   we were using.   Back in those days we weren't

18   using DIDs.   Again, we were using disconnected

19   ANIs that we received from the owner of Globex.

20        Q.    (BY MR. ABERNETHY)   Do you know what

21   the peak of that call volume would have been?

22        A.    The peak?

23        Q.    The peak of the call volume for

24   Health Advisors.

25              DEFENSE COUNSEL:   Objection.

```
 1        A.   No, I have no clue.

 2        Q.   (BY MR. ABERNETHY)  Do you have any

 3   clue about the low of that call volume?

 4             DEFENSE COUNSEL:  Objection.

 5        A.   No.

 6        Q.   (BY MR. ABERNETHY)  Do you know what

 7   DNC scrubbing is?

 8        A.   Yes.

 9        Q.   What do you understand that to mean?

10        A.   We have that on our system now,

11   federal scrubbing of the DNC list.  All the

12   federal people that have gone on and removed

13   their number from the federal do-not-call

14   registry -- put their number on the general

15   call registry for the FCC.

16        Q.   And by on your system now, you mean

17   Great Choice?

18        A.   On Great Choice, on -- even on

19   JSquared we had it.

20        Q.   Did Rising Eagle have DNC scrubbing?

21        A.   Huh-uh.

22             MS. REYES:  Is that a "no"?

23             THE WITNESS:  No.

24        Q.   (BY MR. ABERNETHY)  Do you know what

25   DNC blocking is?
```

1     A.   No -- DNC blocking on Veriswitch?

2     Q.   Just do you have any understanding of

3 the phrase "DNC blocking"?

4     A.   I know it's a -- it's a functionality

5 on Veriswitch that if a call is trying to go

6 outbound and that person's on the federal

7 do-not-call registry, it automatically searches

8 for it; and it cancels the call.

9     Q.   So did Rising Eagle ever have that?

10    A.   Huh-uh.

11        MS. REYES:  "No"?

12        THE WITNESS:  No.

13    Q.   (BY MR. ABERNETHY)  Did Rising Eagle

14 ever use any other type of DNC blocking?

15    A.   No.  We trusted what Smith was

16 telling us when he said he scrubbed the leads.

17 We trusted that he scrubbed the leads.  We

18 never had a SAN number.

19    Q.   What's a SAN number?

20    A.   It's the FCC number you get when you

21 purchase the federal do-not-call registry

22 download.

23    Q.   So did Michael Smith tell you how he

24 was doing that?

25        DEFENSE COUNSEL:  Objection.

```
 1       A.   He said he had a SAN number.

 2       Q.   (BY MR. ABERNETHY)  Did you have any other

 3  call-blocking lists that you would use?

 4       A.   Huh-uh.

 5            MS. REYES:  "No" or "yes"?

 6            THE WITNESS:  No.

 7       Q.   (BY MR. ABERNETHY)  Did you have a

 8  TCPA call list?

 9       A.   Not that I remember.  We might have.

10  Again, I don't -- I don't have a clue in the

11  past.

12       Q.   Did you ever have a litigator list?

13       A.   Yes, we did.  We got it from one of

14  our clients, Michael O'Hare.  He had a

15  litigators list he would sell to us for $750 a

16  month.

17       Q.   And can you explain what your

18  understanding of a litigator list is?

19       A.   It's all the attorney law firms that

20  are setting up honeypots, what are called,

21  where they buy ANIs and they put them out on

22  the internet.  They want people to call them.

23  When people call them, they find out the

24  company that they're associated with.  They

25  file a lawsuit -- a TCPA violation against
```

171

1   them, file a lawsuit against them, and try to

2   collect anywhere from a thousand dollars up to

3   50,000 or up to a hundred thousand.

4        Q.   So if you had an opted-in list, would

5   you have a need for a TCPA litigator list?

6             DEFENSE COUNSEL:   Objection.

7        A.   Yeah, I'd still need that.

8        Q.   (BY MR. ABERNETHY)  Why would you

9   still need that if you have an opted-in list?

10       A.   Because an opted-in list doesn't

11  prevent the lead sellers from putting in

12  fictitious leads.  A lot of times lead sellers

13  would pad the leads with more aged data that

14  they acquired in the past without scrubbing

15  them against the federal do-not-call registry.

16       Q.   Can you explain what you mean by

17  "fictitious leads"?

18       A.   It's a lead.  They just never

19  scrubbed it against the federal do-not-call

20  registry.  So being that they never scrubbed it

21  against the federal do-not-call registry means

22  that they're selling us a lead that may be

23  federal DNC'ed, which means you're not supposed

24  to call any of those numbers.

25       Q.   But it's being sold as a scrubbed

John Spiller - 3/2/2022

174

1      Q.   Would Great Choice?

2      A.   No.

3      Q.   Did you ever scrub for state DNC

4  lists?

5      A.   No.  We only used the federal

6  do-not-call registry.

7      Q.   And when did you start DNC scrubbing

8  with Rising Eagle?

9      A.   2019, around May.

10     Q.   What made you start at that time?

11     A.   We were getting leads from Scott and

12  Mike and they were saying that they were

13  scrubbed and we were wondering why there were

14  so many TCPA violations coming to them.  They

15  were receiving -- at least every two to three

16  weeks they were receiving two or three

17  litigators calling them and telling them to pay

18  5,000 or $3,000.

19            So we were basically

20  presumptuing that they were potentially not

21  scrubbing against the federal do-not-call

22  registry.  So we would scrub the leads after

23  they would send them to us; and it was only

24  then did we really get phone calls from Scott

25  or Mike whenever we would scrub the leads.

1   Let's say they sent us 3 million leads; and

2   after we scrubbed it, we would end up

3   getting -- a file would get cut all the way

4   down to somewhere around 1 million.  And they'd

5   give us a phone call and say, "What the hell?

6   Why'd you scrub those leads?  We told you we

7   already scrubbed them."

8        Q.   So did Mike Smith tell you that those

9   leads were scrubbed?

10       A.   Yes.

11            DEFENSE COUNSEL:  Objection.

12       Q.   (BY MR. ABERNETHY)  And did Scott

13  Shapiro tell you that those leads were

14  scrubbed?

15            DEFENSE COUNSEL:  Objection.

16       A.   On some -- on some lists.  On some

17  lists.  He didn't send me all the lists.  A lot

18  of times Michael Smith was the one that sent me

19  the lists.  Scott Shapiro would only send me a

20  handful of lists.

21       Q.   (BY MR. ABERNETHY)  Okay.  So when

22  y'all started scrubbing, how did y'all do that?

23       A.   Veriswitch has it on the back end.

24       Q.   And when did you start scrubbing for

25  JSquared?

1        A.    May of 2020 -- May or April of 2020.

2        Q.    And when did you start scrubbing for

3   Great Choice?

4        A.    Great Choice never facilitated calls.

5   They only sold VoIP telecom minutes.  So they

6   never had to scrub any leads.

7        Q.    Do you know what recycling leads

8   mean?

9        A.    Yeah.  When a file gets finished, you

10  go into the back end; and you're able to click

11  on "recycle leads."  When you click on "recycle

12  leads," it automatically takes out all the DNC

13  people that pushed two on it, kicks them out;

14  and it uploads all the others that either

15  people pressed one or didn't push a number on

16  those prerecorded messages, to get redialed

17  again.

18        Q.    So did Rising Eagle recycle leads?

19        A.    Yes.

20        Q.    How often?

21        A.    That's too far back.  I can't

22  remember.

23        Q.    Regularly?

24        A.    Yeah.

25        Q.    Did you communicate with Mike Smith

1   basically identifies me as a perpetrator of

2   allowing that call to get into America,

3   allowing that call to reside with the consumer,

4   and whatever violations that the USTelecom came

5   up with deemed necessary for it to be

6   considered a traceback.

7       Q.   And what is USTelecom?

8       A.   The company that was started by David

9   Frankel that eventually got fired last year for

10  snaking clients.

11      Q.   Who handled tracebacks at Rising

12  Eagle?

13      A.   John Spiller.

14      Q.   You handled all the -- those

15  tracebacks?

16      A.   Uh-huh, unless Jakob -- I don't

17  remember Jakob ever helping me.

18      Q.   So where did Rising Eagle get its

19  opt-in information from?

20      A.   Scott Shapiro and Michael Smith.

21      Q.   How did they get opt-in information

22  from Michael Smith?

23      A.   From the leads that they purchased --

24  or in the lead that they purchased.  They

25  purchased them from lead companies that had the

189

1  didn't reply.  I'm sorry, but I'm trying to

2  put" -- John Spiller says, "I'm sorry.  I'm

3  trying to put together money to find the best

4  person for my -- for my best job possible."

5          James, "I think you feel I'm not

6  good for the job.  You should have let me know

7  your mind instead of wasting each other's time.

8  I would have...done [sic] designing the program

9  that would solve the problems for you.  Do you

10 think I can't handle your job?"

11         "How do I know it off a bot" --

12 or John Spiller says, "How do I know if off the

13 bot that needs to be in placed in on a website?

14 [sic]  That is what I was asking.  How is it

15 the bot going to find me that information on

16 the internet, which site, or how does it work?"

17     Q.    We're now on page 015203.

18     A.    Again, this conversation had started

19 on 8/15/2020; and the conversation, I believe,

20 ended as well on that same day.  This is an

21 individual who had reached out to me and told

22 me he was going to create me a bot to search

23 the internet, for $10,000 in bit coins.  For 69

24 million numbers, he was going to find me all

25 the opted-in information that Scott and Mike

1    couldn't give me.

2         Q.   Can you just go ahead and read the

3    rest, and then we'll go over it?

4         A.   Yeah.

5         Q.   This is at the top of 015203.

6         A.   Yeah.

7              "And no -- and now I got tools

8    for this job from the dark web" [sic.]

9              James Wilson, "How do I know it

10   off the bot that needs to be in place on the

11   website that is what" -- okay.  That's what

12   John Spiller quoted.  I quoted what he said.

13             "The both [sic] sorts numbers

14   and groups them into a hundred each."

15             John Spiller says, "I didn't

16   know, but okay.  I'm listening.  I'm just not a

17   programmer and that is why I needed more

18   explanation on what you were talking about

19   first before I send you 10,000 in bit coins

20   because I've already been scammed this year and

21   I don't want to be scammed again" [sic.]

22             "I've done jobs much more

23   complicated [sic] than this.  No one will

24   charge you less.  That's why I insisted you pay

25   to the company for the bot while I do the job

```
1   STATE OF TEXAS      )

2              REPORTER'S CERTIFICATION

3

4        I, DEBBIE D. CUNNINGHAM, CSR, hereby certify that

5   the witness was duly sworn and that this transcript is a

6   true record of the testimony given by the witness.

7        I further certify that I am neither counsel for,

8   related to, nor employed by any of the parties or

9   attorneys in the action in which this proceeding was

10  taken.  Further, I am not a relative or employee of any

11  attorney of record in this cause, nor am I financially

12  or otherwise interested in the outcome of the action.

13       I further certify that pursuant to FRCP

14  Rule 30(f)(1) that the signature of the deponent was

15  requested by the deponent or a party before the

16  completion of the deposition and that the signature is

17  to be before any notary public and returned within 30

18  days from date receipt of the transcript.  If returned,

19  the attached Changes and Signature Page contains any

20  changes and the reasons therefore.

21       Subscribed and sworn to by me this day, March 8,

22  2022.

23

24              _____
                Debbie D. Cunningham, CSR
25
```