# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| STATE OF TEXAS, et al.;<br><br>    Plaintiffs,<br><br>vs.<br><br>RISING EAGLE CAPITAL GROUP, LLC, et al.;<br><br>    Defendants. | Case No. 4:20-cv-02021 |

## PLAINTIFF STATES' CONTESTED FACTS

### HAA, Smith, and Shapiro and the HAA Business

1.     Shapiro founded CRS Marketing LLC, as a Florida limited liability company in 2014.

2.     Shapiro is the Manager and owner of CRS Marketing LLC.

3.     HAA has transacted business in the Southern District of Texas.

4.     Smith has transacted business in the Southern District of Texas.

5.     Shapiro has transacted business in the Southern District of Texas.

6.     Smith used MTSInsurance@gmail.com for HAA business-related correspondence between April 12, 2017 and June 14, 2019.

7.     Shapiro used this cell phone number for business-related communications.

8.     Shapiro used this cell phone number for HAA business-related communications between April 12, 2017 and June 14, 2019.

9.      On April 12, 2017, HAA and Shapiro executed a written contract.

10.     Pursuant to this agreement, Shapiro was contracted to secure insurance contracts and provide strategic services to HAA.

11.     Shapiro was compensated by HAA directly, by Smith through HAA, by other Smith-owned entities, and by Smith personally.

12.     HAA was a call center for different health insurance agents, including Sean Duffie, Zachary Cox, among others.

13.     One of Smith's roles at HAA was to oversee and manage efforts that brought call transfers into the call center.

14.     These call transfers were calls where a consumer requested to speak to an agent when they received the initial robocall.

15.     In this role, Smith ensured the agents were steadily getting a large enough volume of call transfers, so that the agents could sell health insurance products.

16.     Several of the HAA agents sold Health Insurance Innovations ("HII") insurance products.

17.     Some agents at HAA had a contract with HII.

18.     Shapiro had a contract with HII.

19.     Shapiro signed his contract with HII on November 30, 2017.

20.     In his role at HAA, Shapiro negotiated and secured HAA's ability to sell HII products.

21.     Shapiro was compensated by HII when HAA sold an HII product.

22.     When an agent sold an insurance product, HAA would receive forty (40) percent of the first month's residual and all of the subsequent residuals.

23.     Marsha Griffin was an employee of HAA.

24.     Marsha Griffin was also HAA's registered agent.

## The Rising Eagle Group - General

25.     John Spiller ("Spiller") is an individual residing in the Southern District of Texas.

26.     Jakob Mears ("Mears") is an individual residing in the Southern District of Texas.

27.     On April 9, 2014, Spiller formed Rising Eagle Capital Group LLC ("Rising Eagle") as a Texas Limited Liability Company.

28.     On June 1, 2018, Spiller filed an amendment with the Texas Secretary of State making Jakob Mears the registered agent and a governing Member of Rising Eagle.

29.     On January 30, 2019, Spiller formed JSquared Telecom LLC ("JSquared") in Texas.  Spiller named himself as the registered agent and Rising Eagle Capital Group LLC as the sole managing member.

30.     Rising Eagle Capital Group – Cayman ("Rising Eagle Cayman") is a Cayman Island based entity established in 2019.

31.     On January 13, 2020, Mears amended JSquared's formation to make Rising Eagle Capital Group Cayman as the sole managing member, replacing Rising Eagle Capital Group LLC.

32.     Collectively, Spiller, Mears, Rising Eagle, Rising Eagle Cayman, and JSquared are referred to as the "Rising Eagle Group."

33.     Spiller and Mears served as the only two directors and officers of Rising Eagle and JSquared.

34.     Spiller and Mears served as the only two directors and officers of Rising Eagle Cayman.

35.     Spiller and Mears operated Rising Eagle.

36.     Spiller and Mears operated JSquared.

37.     Spiller and Mears operated Rising Eagle Cayman.

38.     Between February 12, 2018 and June 14, 2019, the Rising Eagle Group initiated telephone calls using pre-recorded messages or an artificial voice at the direction of the HAA, Smith, and/or Shapiro.

39.     Members of the Rising Eagle Group were working on behalf and at the direction of HAA, Smith, and Shapiro, and were therefore agents of HAA, Smith, and Shapiro.

40.     Shapiro was working on behalf and at the direction of HAA and Smith, and was therefore an agent of HAA and Smith.

41.     HAA and Smith authorized Shapiro to contact Rising Eagle Group regarding telemarketing.

42.     The HAA, Smith, and/or Shapiro did not have a contract with the Rising Eagle Group regarding the telemarketing operation.

43.     HAA and Smith ratified Shapiro's conduct in contacting the Rising Eagle Group regarding telemarketing.

## The Rising Eagle Group – Robocalling

44.     The Rising Eagle Group initiated telephone calls using pre-recorded messages or artificial voices, also known as "robocalls," to residents of Arkansas, Indiana, Michigan, North Carolina, North Dakota, Ohio, and Texas.

45.     The Rising Eagle Group made telephone calls using an artificial or pre-recorded voice to the cellular telephones of residents of Arkansas, Indiana, Michigan, North Carolina, North Dakota, Ohio, and Texas.

46.     The Rising Eagle Group initiated telephone calls using an artificial or pre-recorded voice to the residential lines of residents of Arkansas, Indiana, Michigan, North Carolina, North Dakota, Ohio, and Texas.

47.     The Rising Eagle Group initiated telephone solicitations to residents of Arkansas, Indiana, Michigan, North Carolina, North Dakota, Ohio, and Texas whose phone numbers were registered on the National Do Not Call Registry.

48.     The Rising Eagle Group initiated telephone sales calls to residents of Indiana on the Indiana Do Not Call List.

49.     The HAA, Smith, and/or Shapiro caused the Rising Eagle Group to initiated telephone sales calls to residents of Indiana on the Indiana Do Not Call List.

50.     The HAA, Smith, and/or Shapiro substantially assisted the Rising Eagle Group in initiating telephone sales calls to residents of Indiana on the Indiana Do Not Call List.

51.     The HAA, Smith, and/or Shapiro knew or consciously avoided knowing the Rising Eagle Group was initiating sales calls to residents of Indiana on the Indiana Do Not Call List.

52.     The Rising Eagle Group initiated robocalls to residents of Texas on Texas's Do Not Call List.

53.     The HAA, Smith, and/or Shapiro caused the Rising Eagle Group to initiated telephone sales calls to residents of Texas on Texas's Do Not Call List

54.     The HAA, Smith, and/or Shapiro and the Rising Eagle Group are telephone solicitors.

55.     Spiller and Mears operated the Rising Eagle Group's dialer equipment.

56.     Spiller and Mears used the hosted predictive dialer software product "Hello Hunter" to send calls on behalf of the HAA, Smith, and/or Shapiro.  With their dialer, Spiller and Mears were able to control the volume or total number of outbound calls that were placed at any particular time. The equipment allowed Spiller and Mears to load and store phone numbers to be called as a computer file, then to select a pre-recorded message for a particular calling campaign, and then to begin calling phone numbers that were loaded from the stored computer file that would disseminate the selected recorded message to those phone numbers called.

57.     Then the system would send a phone call that played a pre-recorded message or artificial message to the call recipient on those preloaded phone numbers.

58.     Spiller accomplished this by setting up computer servers in the Philippines that were designed for calling high volumes of telephone numbers for such a robocalling operation.

59.     A server could make 150,000 calls per minute.

60.     Each call would play the selected pre-recorded or artificial message.

61.     Hello Hunter had the capability to store telephone numbers to be called.

62.     The HAA, Smith, and/or Shapiro knew or were on notice of how the Rising Eagle Group's robocalling system worked.

### HAA, Smith, and/or Shapiro and the Rising Eagle Group

63.     To communicate with Spiller and Mears, Smith and Shapiro used phone calls, text messages, and emails.

64.     Spiller controlled the email account RPGLeads@gmail.com.

65.     Spiller used the account for business-related communications.

66.     Mears controlled the email account j.rpgleads@gmail.com.

67.     Mears used the account for business-related communications.

68.     Spiller and Mears managed the email account: RPGScottandMike@gmail.com.

69.     Spiller sent text messages to Shapiro and received text messages from Shapiro.

70. Spiller and Shapiro sent messages to each other regarding the Rising Eagle Group's telemarketing campaign(s) for the HAA, Smith, and/or Shapiro.

71. Spiller sent text messages to Smith and received text messages from Smith.

72. Spiller and Smith sent messages to each other regarding the Rising Eagle Group's telemarketing campaign(s) for the HAA, Smith, and/or Shapiro.

73. Spiller and Mears sent text messages to each other regarding their businesses, including about their telemarketing campaigns.

74. Shapiro sent phone numbers, identified as lead lists, to the Rising Eagle Group.

75. Shapiro communicated with Spiller and Mears directly regarding their telemarketing campaign(s) for the HAA, Smith, and/or Shapiro.

76. On April 5, 2018, Spiller and Shapiro begin texting regarding the telemarketing operation.

77. On July 7, 2018, Shapiro emailed RGPScottandMike@gmail.com for the first time.

78. Smith authorized Griffin to send lists of telephone numbers to the Rising Eagle Group.

79. Smith authorized Shapiro to send lists of telephone numbers to the Rising Eagle Group.

80. The lists of telephone numbers sent by Griffin and Shapiro to the Rising Eagle Group, as authorized by Smith, were all sent for the purpose of having the Rising Eagle Group initiate phone calls to each of these telephone numbers.

81.     The lists of telephone numbers sent by Griffin and Shapiro to the Rising Eagle Group, as authorized by Smith, were all sent for the purpose of having the Rising Eagle Group initiate phone calls to these telephone numbers that played particular pre-recorded messages or used an artificial voice.

82.     When the Rising Eagle Group made a call, the recipient received a pre-recorded message and had the option of self-selecting to be placed on a do-not-call list or to be connected to an agent at a call center.  If a call recipient pressed "1" to talk to an agent, he or she would be routed to Health Advisors' Vicidial system.

83.     To manage the incoming inbound calls, HAA used Vicidial, beginning on June 2, 2017.

84.     Vicidial is a contact center software and offers call center services.

85.     When Spiller and/or Mears initiated a robocall using Hello Hunter, the call recipient would receive a pre-recorded message and/or an artificial voice message instructing the call recipient to press a number if the call recipient was interested in speaking to an agent.

86.     If the call recipient pressed a number that requested the caller to be transferred to an agent, the system would route the call to HAA's call center.

87.     At HAA, a "fronter" would answer the call and "qualify" the lead to ensure that an insurance agent was available to sell the call recipient a health insurance product and that the call recipient was interested in, and capable of, purchasing a health insurance product.

88.    A majority of the HAA staff were "fronters."

89.    The Vicidial platform recorded the audio conversations for HAA's inbound telephone calls.

90.    On the Vicidial platform, the HAA, Smith, and/or Shapiro could monitor real-time statistics on how the inbound call campaigns were performing, specifically how many agents and/or fronters were available to take calls.

91.    The HAA, Smith, and/or Shapiro gave the Rising Eagle Group access to this real-time dashboard.

92.    Through their agents and fronter, HAA kept track of all call recipient's responses in the Vicidial system.

93.    Responses included:

  a. Answering Machine

  b. Busy

  c. Broke

  d. Can't afford

  e. Call Back

  f. Disconnected Number

  g. Declined Sale

  h. DO NOT CALL

  i. Agent Not Available

  j. Lead Being Called

  k. No Answer

l.     Not Interested

m.    No Pitch No Price

n.     Lead to Be Called

o.     Fake Recording

p.     Sale Made

q.     Call Transferred

94. The responses of "Do Not Call," "No Answer," "Not Interested," and "Fake Recording" accounted for over 90% of HAA's call volume.

95. For calls that were transferred from the Rising Eagle Group to HAA, an HAA fronter would first speak with the call recipient and verify the recipient's location and their need for health insurance.

96. After speaking to an HAA fronter, the call recipient would be transferred to a person legally qualified to sell insurance in the call recipient's state.

97. Daily, call recipients notified HAA employees that their phone numbers were on the National Do Not Call Registry.

98. Daily, call recipients notified HAA employees that they wanted to stop receiving robocalls from the HAA, Smith, and/or Shapiro and the Rising Eagle Group.

99. Agents working at HAA were licensed to sell insurance in Arkansas, Indiana, Michigan, North Carolina, North Dakota, Ohio, and Texas.

100. Agents working at HAA sold health insurance to the residents of Arkansas, Indiana, Michigan, North Carolina, North Dakota, Ohio, and Texas.

101.    Agents working at HAA sold health insurance to the residents of Arkansas, Indiana, Michigan, North Carolina, North Dakota, Ohio, and Texas as a result of inbound calls generated by Rising Eagle Defendants' telemarketing campaign(s).

102.    In one of the Rising Eagle Group's calls, a pre-recorded message played the following outbound message to call recipients:

> Hi, this is Ann. I am calling to let you know we have been granted a limited health enrollment period for a few weeks, so you and your family can get a great insurance plan at the price you can afford. And we make it hassle free to sign up. We have pre-approvals ready in your area including Cigna, Blue Cross, Aetna, United and many more. Press 1 to get a hassle-free assessment or press 2 to be placed on our do not call list. Thanks for your time and be healthy and blessed.

103.    The HAA, Smith, and/or Shapiro worked with the Rising Eagle Group to craft and edit the scripts for the pre-recorded messages.

104.    The HAA, Smith, and/or Shapiro directed which pre-recorded message to use.

105.    The HAA, Smith, and/or Shapiro advised the Rising Eagle Group about when to use a particular pre-recorded message.

106.    The Rising Eagle Group used the Hello Hunter system to send test calls that played a pre-recorded message to Smith and Shapiro directly.

107.    These calls were sent to test the Caller ID to see if the calling number prompted a call label that read "spam likely," and also to test to see if the call would properly transfer to the HAA call center.

108.   Further, the Rising Eagle Group would use the Hello Hunter system to send test calls that played a pre-recorded message to Smith and Shapiro so that Smith and Shapiro could listen to and approve of the pre-recorded message.

109.   For all calls initiated by the Rising Eagle Group, a live human being never preceded the pre-recorded or artificial message. The only voice a call recipient heard when the call was first connected to the call recipient was from a pre-recorded or artificial message.

110.   The HAA, Smith, and/or Shapiro and the Rising Eagle Group used the term "AI calls," rather than "robocalls," to mean a call using a pre-recorded or artificial message.

111.   The HAA, Smith, and/or Shapiro directed the Rising Eagle Group when to start initiating or making the telephone calls that played a pre-recorded message or used an artificial voice.

112.   The HAA, Smith, and/or Shapiro directed the Rising Eagle Group when to stop initiating or making the telephone calls that played a pre-recorded message or used an artificial voice.

113.   If there were too many agents and/or fronters waiting, meaning not connected to a call, Smith or Shapiro would direct the Rising Eagle Group to turn up or increase the number of robocalls the Rising Eagle Group was initiating from their dialer.

114.   As the robocall output increased, there would be more call recipient transfers to HAA's call center.

115.    If there were not enough agents and/or fronters waiting, Smith or Shapiro would direct the Rising Eagle Group to turn down or decrease the number of robocalls initiated from the Rising Eagle Group.

116.    As the robocall output decreased, there would be less call recipient transfers to HAA's call center.

117.    If there were no agents and/or fronters available to take calls, for example if there was a lunch break, Smith or Shapiro would direct the Rising Eagle Group to stop sending robocalls.

118.    If the robocall output stopped, there would be no call recipient transfers to HAA's call center.

119.    On December 28, 2018, Smith texted Mears: "All sales are count (sic) because you guys are the only source we use for leads."

120.    Shapiro sent lead lists that contained phone numbers of residents of Arkansas, Indiana, Michigan, North Carolina, North Dakota, Ohio, and Texas.

121.    In these lead lists sent by Shapiro, some of the phone numbers also included address information associating the phone numbers specifically with Arkansas, Indiana, Michigan, North Carolina, North Dakota, Ohio, and Texas.

122.    Shapiro sent lead lists that contained phone numbers of residents of Arkansas, Indiana, Michigan, North Carolina, North Dakota, Ohio, and Texas on the National Do Not Call Registry.

123.    Shapiro sent lead lists that contained phone numbers of residents of Indiana on the Indiana Do Not Call List.

124.   Shapiro sent lead lists that contained phone numbers of residents of Texas on the Texas Do Not Call List.

125.   The lead lists that Shapiro sent the Rising Eagle Group contained at least 14,615,386 unique telephone numbers.

126.   Shapiro sent the Rising Eagle Group these lead lists for the purpose of having the Rising Eagle Group initiate or make telephone calls that played a pre-recorded message or used an artificial voice to the telephone numbers on the lists.

127.   The HAA, Smith, and/or Shapiro directed the Rising Eagle Group to initiate or make calls to the phone numbers on the lead lists.

128.   HAA and Smith purchased some of the lists that Shapiro sent.

129.   The telephone calls that played a pre-recorded message or used an artificial voice were not made for emergency purposes.

130.   The telephone calls that played a pre-recorded message or used an artificial voice were made for a commercial purpose.

131.   The telephone calls that played a pre-recorded message or used an artificial voice were telephone solicitations.

132.   The telephone calls that played a pre-recorded message or used an artificial voice induced advertisements.

133.   The telephone calls that played a pre-recorded message or used an artificial voice were not made or initiated for a non-profit.

134.   HAA did not have express consent from the call recipients for the Rising Eagle Group to initiate or make a call to them using a pre-recorded or artificial voice.

135.    HAA did not have consent from the call recipients for the Rising Eagle Group to initiate or make a call to them using a pre-recorded or artificial voice.

136.    Smith did not have consent from the call recipients for the Rising Eagle Group to initiate or make a call to them using a pre-recorded or artificial voice.

137.    Shapiro did not have express consent from the call recipients for the Rising Eagle Group to initiate or make a call to them using a pre-recorded or artificial voice.

138.    Shapiro did not have consent from the call recipients for the Rising Eagle Group to initiate or make a call to them using a pre-recorded or artificial voice.

139.    The Rising Eagle Group did not have express consent from the call recipients for the Rising Eagle Group to initiate or make a call to them using a pre-recorded or artificial voice.

140.    The Rising Eagle Group did not have express consent from the call recipients on the National Do Not Call Registry for the Rising Eagle Group to initiate or make a telephone solicitations.

141.    The Rising Eagle Group's primary contacts at HAA were Smith and Shapiro.

142.    HAA and Smith had an unwritten agreement with Spiller for the Rising Eagle Group to provide HAA with call transfers.

143.    The Rising Eagle Group initiated calls to residential lines using artificial or pre-recorded voices to deliver messages without the prior express consent of the called parties.

144.    The Rising Eagle Group initiated calls to cellular lines using artificial or pre-recorded voices to deliver messages without the prior express consent of the called parties.

145.     Defendants HAA and Smith did not have the prior express consent of the called parties for the leads that HAA, Smith, and/or Shapiro provided to the Rising Eagle Group.

146.     Defendant Shapiro did not have the prior express consent of the called parties for the leads that HAA, Smith, and/or Shapiro provided to the Rising Eagle Group.

147.     The HAA, Smith, and/or Shapiro did not contractually require the Rising Eagle Group to obtain prior express consent of the telephone numbers on the lead lists provided to the Rising Eagle Group.

148.     On March 22, 2019, Smith texted Mears to block a phone number with a Columbus, Ohio area code, stating "pls block this faggot" and "Can't you scrub ppl from the national dnc"?  Mears responded: "I think we have to register a business to get access to that list," and "Like through them and say what we do and everything."  Smith responded: "We're getting hit with lawsuits left and right," and "We have to find a way to not call these fucks."  Smith then wrote "He's on the DNC."

149.     HAA and Smith paid the Rising Eagle Group a set price per sale made for health insurance products by HAA.

150.     Smith and HAA paid the following amounts to the Rising Eagle Group from accounts associated with each of the following:

     a.     HAA paid Rising Eagle $1,384,305.00 in 2018.

     b.     HAA paid Rising Eagle $1,119,348.00 in 2019.

     c.     Smith, personally, paid Rising Eagle $30,000.00 in 2018.

     d.     Smith, personally, paid Rising Eagle $328,000.00 in 2019.

151.    Smith and HAA paid the following amounts to Shapiro:

    a.    HAA and Smith paid CRS Marketing over $1 million in 2018.

    b.    HAA and Smith paid CRS Marketing over $750,000 between January 1, 2019 and June 14, 2019.

152.    In 2018, HAA had deposits of over $9 million.

153.    From January 1, 2019 until June 14, 2019, HAA had deposits of over $4.5 million.

154.    In 2018, Smith's personal Chase bank account had over $800,000 in deposits.

155.    From January 1, 2019 until June 14, 2019, Smith's personal Chase bank account had over $2.25 million in deposits.

156.    On September 17, 2018, Zach Cox, an HAA Agent and brother-in-law to Smith, settled a private TCPA claim brought against HAA on behalf of HAA.

157.    After settling the matter, Marsha Griffin emailed HII notifying HII of the settlement.

158.    On December 13, 2019, the State of Florida served Smith an administrative complaint regarding their telemarketing practices at 8140 Northwest 51st Place, Coral Springs, Florida. The person serving the complaint made a copy of Smith's photo identification as proof of service.

159.    On or around February 8, 2019, the State of Missouri sued Mike Smith over his telemarketing practices.

160.    On March 6, 2019, Smith texted Mears "no more sales in MO and emailed a list to ramp up."

161.    On March 6, 2019, Shapiro emailed RPGScottandMike@gmail.com over one million phone numbers. The purpose of this email was for the Rising Eagle Group to call the phone numbers.

### Health Advisor Defendants and HII

162.    Shapiro was one of HAA's contacts for HII.

163.    Marsha Griffin was one of HAA's contact for HII.

164.    Shapiro had authority to contact HII on HAA's behalf.

165.    Marsha Griffin had authority to contact HII on HAA's behalf.

166.    At HII, Shapiro and Griffin would communicate with Amy Brady ("Brady").

167.    On September 17, 2018, Brady emailed Shapiro that HAA was "the worst" TCPA violators.

168.    September 20, 2018, HAA started using Active Prospect's litigator scrub tool.

169.    On June 12, 2018, Brady sent Shapiro an email, writing "Hey Scott . . . see below. You called one of our employees today," and below, the email stated: "Gamlen just got robodialed on his cellphone."

170.    Shapiro text messaged this complaint to Spiller as a screen shot.

### Spiller in Jail

171.    While Spiller was incarcerated, Mears ran the Rising Eagle Group's corporate entities and daily operations.

172.    While Spiller was incarcerated, Spiller directed Mears on how to run the Rising Eagle Group's daily operations via telephone conversations.

173.    Those conversations were recorded by the jail recording system.

174.    Shapiro knew that Spiller was incarcerated.

175.    Smith knew that Spiller was incarcerated.

176.    While Spiller was incarcerated, Shapiro spoke with Spiller and Mears.

177.    One exchange, on December 15, 2028, was as follows:

- Spiller: You all guys used to pay us seventy-five hundred dollars for thirty six sales, right?

- Shapiro: Correct.

- Spiller: Well now we have increased that 36 sales, you pay us eighty-one hundred dollars, okay?

- Shapiro: Okay.

- Spiller: Now, you all guys asked us to reduce the costs of any time you all hit 200 sales in a week. You wanted to reduce it from two thousand down to a thousand dollars, right?

- Shapiro: That's what Mike said. [muffled].

- Spiller: So, okay, okay. So we agreed to that. So if we agreed with that, then this past week on Friday, we should have received ninety-one

hundred dollars as a bonus and we should have been paid eighty-one

hundred on top of it. But.

- Shapiro: [muffled] No, no, no. Hang up with me and call Mike. I don't

  know what he's done with these numbers. I just know he has the ones.

  Just call Mike.

- Later in the call, Defendants Spiller and Mears call Defendant Smith.

  Defendant Smith states "I don't know how many deals I got, we got. I'll

  ask Scott. More than likely we'll be on the wire. . . . So I'll check with

  him."

178.    While Spiller was incarcerated, Smith spoke with Spiller and Mears.

179.    In a call on December 15, 2018, Smith stated: "I don't know how many

deals I got, we got. I'll ask Scott. More than likely we'll be on the wire. . . . So I'll check

with him."

180.    On December 14, 2018, Shapiro spoke with Spiller and Mears over the

phone while Spiller was incarcerated.

181.    On this December 14, 2018 call, Shapiro, Spiller, and Mears discussed the

Rising Eagle Group's telemarketing campaigns for the HAA, Smith, and/or Shapiro.

182.    A transcript of the conversation is below:

a.   Shapiro: And my room is only eleven thousand, twelve thousand,

     maybe thirteen sometimes. I mean, I thought I was going to get a lot

     more calls at first. I know obviously it's a little different now. But, I

     could just tell all the time, like I told Jakob, I am having thirty to forty

people waiting at one time. Like, there is never a time when everybody is on the phone. Never. You can ask Jakob. Like never. Like never. Even when I send him new leads it's still never like that. That's why I think the cluster or there is not enough server or what the problem is, but you do.

b. Spiller: I do know for a fact they are on a cluster, they are already on their own cluster, they are on cluster forty-eight. It used to be a cluster you used to use, right?

c. Shapiro: Right.

d. Spiller: So we cut it in half, and we gave it half to them, so they can use it. So what we can do is, is we can retake some of the leads that they sent us and we can put them in. We can add some more clout to their server.

e. Shapiro: Yeah, because remember eleven hundred a day is not enough for thirty people. It's not. Eleven hundred calls is nothing for thirty people. Yeah, and mine is the same thing. I give them leads almost every day and nothing. I still have thirty people, forty people waiting at a time. . . . Something is going on that I am not getting enough calls.

f. Spiller: Ultimately, what it comes down to is two things: it's the leads and it's also the control of the dialer. The dialer dialing out.

g. Shapiro: Right.

h.  Spiller: And that's something else I need to tell you. You don't have to worry about anything about your name being released because of robodialing. Your name is 100% protected on the backend because when I switched you over to RSquared I protected your name of your business.

i.  Shapiro: I don't know what you're talking about robodialing.

j.  Spiller: Okay.

k.  Shapiro: What do you mean? Yeah, I don't know what you mean. I don't know what that is.

l.  Spiller: Okay. Sounds good.

m.  Shapiro: Okay, so can you fix it or get with Jakob to fix it. I don't know.

n.  Spiller: Yes, sir. I'll get with Jakob to fix it.

o.  Shapiro: Yeah, the AI calls need to be fixed. They're not getting enough calls and I'm not getting enough.

p.  Spiller: Sounds good.

q.  Shapiro: Okay, thanks guys. Bye now.

183.  Shapiro then hung up. A few minutes later he called back.

184.  A transcript of that exchange is below:

• Shapiro: John, this is the thing. I don't want to do robocalls, and I hope we're not doing robocalls, and press one. We should be doing AI calls.

• Spiller: Yes, sir. The only thing we are using is AI.

- Shapiro: Just make sure it isn't robocalls and press one. I don't want to do that. I called because I didn't understand what you meant.

- Shapiro: Yes, sir. Understand.

- Shapiro: John, see if you can figure out what the problem is with the AI calls.

- Spiller: Hey Scott. Since we are putting you on your own server to increase call speed, we ask you pay the two twenty five moving forward today.

- Shapiro: That's fine, no problem.

## Knowledge

185.    The HAA, Smith, and/or Shapiro had knowledge of the National Do Not Call Registry.

186.    HAA was registered for the National Do Not Call Registry.

187.    HAA had a "Subscription Account Number."

188.    The HAA, Smith, and/or Shapiro had knowledge that different states also have do not call lists.

189.    The HAA, Smith, and/or Shapiro have knowledge of what a pre-recorded or artificial message is.

190.    The HAA, Smith, and/or Shapiro knew that the term "robocall" meant a telephone call that played a pre-recorded message or used an artificial voice.

191.    The HAA, Smith, and/or Shapiro knew that the term "press-1" meant a robocall that played a pre-recorded message or used an artificial voice instructing the call recipient to "press 1" to be connected with an agent.

192.    The HAA, Smith, and/or Shapiro knew that the term "AI Call" meant a robocall that played a pre-recorded message or used an artificial voice.

193.    The HAA, Smith, and/or Shapiro knew that the Rising Eagle Group was initiating and/or making robocalls that played a pre-recorded message on their behalf.

194.    The HAA, Smith, and/or Shapiro authorized the Rising Eagle Group to initiate and/or make robocalls that played a pre-recorded message on their behalf.

195.    The HAA, Smith, and/or Shapiro ratified Spiller and Mears's robocalls that played a pre-recorded message on their behalf.

196.    The HAA, Smith, and/or Shapiro had knowledge that the Rising Eagle Group was calling phone numbers on the National Do Not Call Registry.

197.    The HAA, Smith, and/or Shapiro had knowledge that the Rising Eagle Group was not "scrubbing" the HAA, Smith, and/or Shapiro' leads that were on the National Do Not Call Registry, meaning that the Rising Eagle Group was not checking which numbers on the lead lists were also on the National Do Not Call Registry and removing those numbers from the lead lists.

198.    The HAA, Smith, and/or Shapiro did not contractually specify how the Rising Eagle Group was to initiate calls or if could or could not use pre-recorded or artificial messages in their telemarketing campaigns.

199. The HAA, Smith, and/or Shapiro did not contractually require the Rising Eagle Group to scrub the lead lists provided by the Health Advisor Defendants for numbers on the National Do Not Call Registry or any state do not call list.

200. The HAA, Smith, and/or Shapiro were not registered as telemarketers to receive the Indiana Do Not Call List.

201. The Rising Eagle Group was not registered as telemarketers to receive the Indiana Do Not Call List.

202. The HAA, Smith, and/or Shapiro did not contractually require the Rising Eagle Group to obtain express consent of those phone numbers called.

203. HAA solicited, attempted to sell and/or sold health plans, directly or through third parties, over the telephone to residents of the Plaintiff States.

204. Smith solicited, attempted to sell and/or sold health plans, directly or through third parties, over the telephone to residents of the Plaintiff States.

205. Shapiro solicited, attempted to sell and/or sold health plans, directly or through third parties, over the telephone to residents of the Plaintiff States.

206. HAA acted as a telephone solicitor in the State of Ohio.

207. Smith acted as a telephone solicitor in the State of Ohio.

208. Shapiro acted as telephone solicitor in the State of Ohio.

209. HAA, directly or through one or more salespersons, made telephone solicitations to persons in the Plaintiff States.

210. Smith, directly or through one or more salespersons, made telephone solicitations to persons in the Plaintiff States.

211. Shapiro, directly or through one or more salespersons, made telephone solicitations to persons in the Plaintiff States.

212. HAA has never obtained a telephone solicitor's certificate of registration from the Ohio Attorney General's Office.

213. HAA did not obtain a surety bond issued by a surety company authorized to do business in the State of Ohio which complies with the following conditions:

    a. A copy of the bond is or was filed with the Ohio Attorney General;

    b. The bond is or was in favor of any person, and of the state for the benefit of any person that is injured by any violation of any provision of sections 4719.01 to 4719.1 of the Revised Code or a rule adopted under those sections;

    c. The bond is or was in the amount of fifty thousand dollars; and

    d. The bond is or was maintained and in effect for at least two years after the date on which the telephone solicitor ceased to engage in telephone solicitations.

214. Smith did not obtain a surety bond issued by a surety company authorized to do business in the State of Ohio which complies with the following conditions:

    a. A copy of the bond is or was filed with the Ohio Attorney General;

    b. The bond is or was in favor of any person, and of the state for the benefit of any person that is injured by any violation of any

provision of sections 4719.01 to 4719.1 of the Revised Code or a rule adopted under those sections;

c.  The bond is or was in the amount of fifty thousand dollars; and

d.   The bond is or was maintained and in effect for at least two years after the date on which the telephone solicitor ceased to engage in telephone solicitations.

215.    Shapiro did not obtain a surety bond issued by a surety company authorized to do business in the State of Ohio which complies with the following conditions:

a.  A copy of the bond is or was filed with the Ohio Attorney General;

b.  The bond is or was in favor of any person, and of the state for the benefit of any person that is injured by any violation of any provision of sections 4719.01 to 4719.1 of the Revised Code or a rule adopted under those sections;

c.  The bond is or was in the amount of fifty thousand dollars; and

d.  The bond is or was maintained and in effect for at least two years after the date on which the telephone solicitor ceased to engage in telephone solicitations.

216.    When soliciting residents of the Plaintiff States over the telephone in connection with the sale of health insurance plans, directly or through salespersons, HAA failed to, within the first sixty seconds of telephone solicitation, disclose the solicitor's true name and the name of the company on whose behalf the solicitations were made.

217.   When soliciting residents of the Plaintiff States over the telephone in connection with the sale of health insurance plans, directly or through salespersons, Smith failed to, within the first sixty seconds of the telephone solicitation, disclose the solicitor's true name and the name of the company on whose behalf the solicitations were made.

218.   When soliciting residents of the Plaintiff States over the telephone in connection with the sale of health insurance plans, directly or through salespersons, Shapiro failed to, within the first sixty seconds of the telephone solicitation, disclose the solicitor's true name and the name of the company on whose behalf the solicitations were made.

219.   HAA did not instruct Rising Eagle Capital Group LLC, JSquared Telecom LLC, Rising Eagle Capital Group – Cayman, John C. Spiller II, or Jakob A. Mears to disclose the name of Health Advisors of America Inc., Michael Smith or Scott Shapiro as the entity on whose behalf the telephone solicitations were being made in connection with the outbound telephone calls being made to solicit or sell health insurance plans.

220.   Smith did not instruct Rising Eagle Capital Group LLC, JSquared Telecom LLC, Rising Eagle Capital Group – Cayman, John C. Spiller II, or Jakob A. Mears to disclose the name of Health Advisors of America Inc., Michael Smith or Scott Shapiro as the entity on whose behalf the telephone solicitations were being made in connection with the outbound telephone calls being made to solicit or sell health insurance plans.

221.     Shapiro did not instruct Rising Eagle Capital Group LLC, JSquared Telecom LLC, Rising Eagle Capital Group – Cayman, John C. Spiller II, or Jakob A. Mears to disclose the name of Health Advisors of America Inc., Michael Smith or Scott Shapiro as the entity on whose behalf the telephone solicitations were being made in connection with the outbound telephone calls being made to solicit or sell health insurance plans.