**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

STATE OF TEXAS, et al.,

     Plaintiffs,

     v.

RISING EAGLE CAPITAL GROUP LLC, et al.,

     Defendants.

CASE NO. 4:20-cv-02021

**PLAINTIFFS' MOTION TO SHOW CAUSE WHY DEFENDANT JOHN C.**
**SPILLER, II SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR**
**VIOLATING THE STIPULATED ORDER**

## TABLE OF CONTENTS

**Page No.**

I. STATEMENT OF THE ISSUES ................................................................. 3

II. INTRODUCTION ................................................................................. 3

III. FACTS ................................................................................................ 4

    A. The Underlying Case ................................................................... 4

    B. Defendant Spiller's Continuing Conduct .................................... 15

IV. DISCUSSION ..................................................................................... 40

    A. The Permanent Injunction Binds Defendant. ............................. 42

    B. Defendant Has Violated the Permanent Injunction and Other Orders of the Court Governing Business Operations ....................................... 42

    C. Defendant Has Violated Further Orders of the Court. .............................. 52

    D. The Court May Hold the Defendant in Civil Contempt Based on the  Record if He Fails to Raise a Genuine Issue for Hearing. ..................................... 52

IV. CONCLUSION ................................................................................... 53

Plaintiff States of Arkansas, Indiana, Michigan, Missouri, North Carolina, North Dakota, Ohio, and Texas (collectively "Plaintiffs" or "Plaintiff States") respectfully move this Court to order Defendant John C. Spiller, II ("Spiller") to show cause why he should not be held in civil contempt and brought before the Court at a time and place fixed by the Court to answer for his violations of the Stipulated Order for Permanent Injunction and Monetary Judgment ("Stipulated Order" or "Order") issued on March 6, 2023. ECF No. 220. As grounds for this motion, Plaintiff States provide the following:

## I.     STATEMENT OF THE ISSUE

Whether the Court should hold Defendant Spiller in civil contempt for repeated and flagrant violations of the Stipulated Order.

## II.     INTRODUCTION

Plaintiff States filed their Second Amended Complaint on October 30, 2020 (ECF No. 56) against Spiller and co-defendants alleging violations of federal and state telephone privacy and telemarketing laws in connection with the initiation of millions of outbound telephone calls which delivered artificial or prerecorded voice messages ("Robocalls") to residents of the Plaintiffs' states for the purpose of generating sales leads. Defendants Spiller and Jakob A. Mears ("Mears") co-owned Defendants Rising Eagle Capital Group LLC, JSquared Telecom LLC, and Rising Eagle Capital Group–Cayman, which Spiller and Mears operated from Texas. They designed and provided a telephone dialer platform that was used to initiate and deliver deceptive and abusive Robocalls on behalf of their customers, including Defendants Health Advisors of America, Inc, Michael T. Smith, Jr., and Scott Shapiro (collectively "Health Advisors Defendants").

3

The Plaintiff States' claims against Defendants Spiller and Mears were resolved with the Court's Entry of Stipulated Orders for Permanent Injunctions and Monetary Judgments.  ECF Nos. 220, 221. Similarly, Plaintiffs' claims against Health Advisors Defendants were resolved with the Court's entry of Stipulated Orders for Permanent Injunctions and Monetary Judgments.  ECF No. 255, 256. Plaintiffs dismissed their claims against reportedly defunct Defendants Rising Eagle Capital Group LLC, JSquared Telecom LLC, and Rising Eagle Capital Group–Cayman upon Spiller's agreement to take affirmative actions to dissolve those entities. ECF Nos. 228, 220 at 29-30.

Despite this Court's Order permanently enjoining Spiller from engaging in or facilitating enumerated illegal telemarketing practices, including being involved in robocalling, Spiller continues to harass consumers in the Plaintiffs' states and nationwide with deceptive and abusive Robocalls and has otherwise failed to comply with the terms of the Order. Further, Spiller has deliberately and knowingly taken steps to hide his identity and actions from Plaintiffs and the Federal Communications Commission ("FCC"). Therefore, Plaintiff States respectfully request this Court issue an order for Spiller to appear before the Court to show cause why he should not be held in civil contempt.

## III.   FACTS

### A.   The Underlying Case

Plaintiffs States filed their Second Amended Complaint on October 30, 2020, alleging that Spiller and co-defendants initiated millions of Robocalls, advertising various goods and services to residential and/or cellular telephone numbers of residents located within the jurisdiction of the Plaintiffs and other states throughout the United States without

the prior express consent of the called parties in violation of multiple sections of the Telephone Consumer Protection Act ("TCPA") and its implementing rules, 47 C.F.R. § 64.1200(c)(2), 47 U.S.C. § 227(c), 47 C.F.R. § 64.1200(a)(3), 47 U.S.C. § 227(b)(l)(B), 47 C.F.R. § 64.1200(a)(1)(iii), 47 U.S.C. § 227(b)(1)(A)(iii), 47 C.F.R. § 64.1200(a)(2), 47 C.F.R. § 64.1200(b)(1), 47 U.S.C. § 227(d)(3)(A), 47 C.F.R. § 64.1604(a), and 47 U.S.C. § 227(e)(1), the Telemarketing Act, 15 U.S.C. § 6102(c), multiple sections of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.3(a)(2)(iii) (or 16 C.F.R. § 310.3(b) in the alternative), 16 C.F.R. § 310.3(a)(4) (or 16 C.F.R. § 310.3(b) in the alternative), 16 C.F.R. § 310.4(d)(1) (or 16 C.F.R. § 310.3(b) in the alternative), 16 C.F.R. § 310.4(b)(1)(ii) (or 16 C.F.R. § 310.3(b) in the alternative), 16 C.F.R. § 310.4(b)(1)(iii)(B) (or 16 C.F.R. § 310.3(b) in the alternative), 16 C.F.R. § 310.4(b)(1)(v) (or 16 C.F.R. § 310.3(b) in the alternative), and various state statutes. ECF No. 56 at 42-72.

Directly and through his corporate entities, Spiller provided customers with dialer platform services, Voice-over-Internet-Protocol ("VoIP") services, or both, to initiate and deliver deceptive and abusive Robocalls without the requisite consent of the called parties residing in the Plaintiffs' States and throughout the country. Despite his customer Health Advisor Defendants having no relationships with the identified insurance companies, Spiller initiated millions of deceptive Robocalls on their behalf, such as:

> Hi, this is Ann. I am calling to let you know we have been granted a limited health enrollment period for a few weeks, so you and your family can get a great insurance plan at the price you can afford. And we make it hassle free to sign up. We have pre-approvals ready in your area including Cigna, Blue Cross, Aetna, United and many more. Press 1 to get a hassle-free

assessment or press 2 to be placed on our do not call list.
Thanks for your time and be healthy and blessed.[1]

For another customer, Spiller provided VoIP services used to send billions of deceptive "auto warranty" Robocalls without the consent of the called parties. One such Robocall stated:

> We've been trying to reach you concerning your cars extended warranty. You should have received something in the mail about your cars extended warranty since we have not gotten a response. We are giving you a final courtesy call before we close out your file. Press two to be removed and put on our do not call list press one to speak with someone about possibly extending or reinstating your cars warranty. Again, press one to speak with a warranty specialist.[2]

In less than five months in 2019, Defendants Rising Eagle and JSquared, under the direction and control of Defendants Spiller and Mears, initiated at least 330 million Robocalls to residential and/or cellular telephones in the eight Plaintiff States. ECF No. 56 at 29. The FCC also initiated an action related to these calls and estimated the nationwide call traffic to be approximately one billion calls over those four-and-a-half months.[3] The astronomical numbers of Robocalls that Spiller was capable of initiating or facilitating underscores the importance of a permanent injunction that is sufficient to deter future violations.

On March 6, 2023, this Court granted Plaintiff States' and Spiller's joint motion for the entry of a Stipulated Order that included permanent injunction provisions, other specific

---

[1] Second Amended Complaint (ECF No. 56 at 30).
[2] Second Amended Complaint (ECF No. 56 at 31).
[3] *In the Matter of John C. Spiller; et al.*, Forfeiture Order, FCC-21-35, March 18, 2021, https://docs.fcc.gov/public/attachments/FCC-21-35A1_Rcd.pdf at p. 1-2 at para 1, 4 at para 8.

orders, and a monetary judgment for statutory damages and civil penalties in the amount of $122,339,320. ECF No. 220 at 31. Spiller was ordered to pay $50,000 in civil penalties on or before twelve months following the Court's Entry of the Order, of which $10,000 was due 30 days following the entry of the Order. Upon such payments, the remainder of the monetary judgment amount would be suspended due to inability to pay, subject to reinstatement if Spiller violated the terms of the Stipulated Order. ECF No. 220 at 33.

Specifically, the Stipulated Order permanently enjoined, required, or ordered Spiller and his companies (including any subsidiaries or affiliates), officers, agents, and employees, and all other Persons in active concert or participation with him, whether acting directly or indirectly, from certain conduct including but not limited to[4]:

    I.    **Permanent Ban on Robocalls.** Engaging in, or Assisting and Facilitating others to engage in, initiating, causing others to initiate, or Assisting or Facilitating others in initiating, Outbound Telephone Call that plays or delivers a Robocall, unless Spiller proves that such prerecorded message was delivered for the purpose of compliance with 16 C.F.R. § 310.4(b)(4)(iii), as amended;

    II.    **Permanent Ban on Telemarketing.** Engaging in, or Assisting and Facilitating others to engage in, Telemarketing, whether acting directly or through an intermediary, including by consulting, brokering, planning, investing, or advising;

---

[4] The list is not the full Stipulated Order, but a curated list that is relevant to this motion.

IV.     **Permanent Ban on Certain Telephone Calls.**  Engaging in, or Assisting and Facilitating others to engage in initiating, causing the initiation of, or transmitting any telephone calls that are placed to telephone numbers on the DNC Registry or any state equivalent thereof;

V.      **Permanent Ban on Certain Telephony Services.** Engaging in, or Assisting and Facilitating others to engage in, providing Telephony Services without having ongoing automated procedures in place to block telephone calls that:

B.      Are transmitted after June 30, 2021, unless changed pursuant to applicable legislation or by agency action, and are not authenticated through the STIR/SHAKEN Authentication Framework, or a successor authentication framework if subsequently mandated by applicable federal law or regulation; for the avoidance of doubt, Defendant Spiller and his companies (including any subsidiaries or affiliates) must also fully implement the STIR/SHAKEN Authentication Framework, or a successor authentication framework if subsequently mandated by applicable federal law or regulation;

C.      Are Robocalls and include any language related to or purportedly related to insurance, warranties, extended coverage, or any other service related contract or agreement for vehicles, either in whole or in part, expressly or indirectly.

VII.    **Network Monitoring.** Engaging in the provision of Telephony Services, without implementing and maintaining constant, up-to-date written policies,

practices, and procedures monitoring, reviewing, and analyzing call traffic to identify, mitigate, and block illegal Robocalls or patterns consistent therewith, including, without limitation, the consideration of call duration, call volume, calls per second, the source or legality of caller ID numbers, the location of the calls' origination or U.S. point of entry, etc.;

VIII.   **Screening of Current and Prospective Customers.** Engaging in, or Assisting and Facilitating others to engage in, providing Telephony Services to any Customer, or new or prospective Customer, without first engaging in a reasonable screening of that Customer, including at a minimum the screening set forth in Subparts (A), (B) and (C) of this Section of the Stipulated Order;

X.   **Ban on Certain Business Relationships.** Engaging in, or Assisting and Facilitating others to engage in, entering into or continuing any business relationship, including, without limitation, consulting services, with a Customer if such Customer is or is likely engaging in any conduct prohibited in Sections I, II, III, IV, or V of the Stipulated Order;

XI.   **Dissolution of Entities.** Take the steps necessary to cause the formal dissolution of Rising Eagle Capital Group LLC, JSquared Telecom LLC, and Rising Eagle Capital Group-Cayman within sixty (60) days of the entry of the Stipulated Order and provide Plaintiffs with documentation of the required dissolution no later than thirty (30) days after completion;

XIII.   **Monetary Judgment.** Pay Plaintiff States the amount of $50,000 (Fifty Thousand Dollars) in civil penalties on or before twelve months following the Court's entry of the Stipulated Order, of which $10,000 shall be due thirty (30) days following the Court's entry of the Stipulated Order. Upon such payments, the remainder of the judgment amount of $122,339,320 (One Hundred and Twenty-Two Million, Three Hundred and Thirty-Nine Thousand, Three Hundred and Twenty Dollars) is suspended due to inability to pay, subject to the terms of the remaining Subsections of Section XI of the Order;

XIV.   **Order Acknowledgements.** Obtain acknowledgments of receipt of the Stipulated Order:

A.      For ten (10) years after entry of the Stipulated Order, Spiller, for any business that he, individually or collectively with any other defendant named in the Complaint, is the majority owner or controls directly or indirectly, must deliver a copy of the Stipulated Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees, agents, and representatives with managerial responsibilities for conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in Section XIII, titled Compliance Reporting. Delivery must occur within seven (7) days of entry of the Stipulated Order for current

personnel. For all others, delivery must occur before they assume their responsibilities;

B.  For ten (10) years after entry of the Stipulated Order, Spiller and any business that he, individually or collectively with any other defendant named in the Complaint, is the majority owner or controls directly or indirectly, must deliver a copy of the Stipulated Order to new Customers prior to executing an agreement to provide services or similar contract or prior to providing any services, whichever is earlier;

C.  Existing Customers of the Rising Eagle Defendants, and for any business that Spiller, individually or collectively with any other defendant named in the Complaint, is the majority owner or controls directly or indirectly, must receive a copy of the Stipulated Order within fourteen (14) days of the entry of the Stipulated Order; and

D.  Spiller will document his delivery of the Order to each Order recipient.

XV.  **Compliance Reporting.** Submit timely compliance reports to the Plaintiffs sworn under the penalty of perjury as follows:

A.  One hundred twenty days (120) days after entry of the Stipulated Order:

1.  Defendant must submit a compliance report (a) identify the primary physical, postal, and email address and telephone

11

number, as designated points of contact, which representatives of the Plaintiffs may use to communicate with him; (b) identify all of Spiller's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including, without limitation, Telephony Services, and the involvement of any other Rising Eagle Defendant or other defendant named in the Complaint (which Spiller must describe if he knows or should know due to his own involvement); (d) if any such business provides Telephony Services, provide a list of Customers terminated pursuant to Section IX, the reasons for such termination, and the underlying documentation reviewed; (e) describe in detail whether and how Spiller is in compliance with each Section of the Stipulated Order; and (f) provide a copy of each Order Acknowledgment obtained pursuant to the Stipulated Order, unless previously submitted to the Plaintiffs; and

2. Spiller must (a) identify all telephone numbers and all physical, postal, email and internet addresses, including all residences; (b) identify all business activities, including any business for which Spiller performs services whether as an employee or otherwise, and any entity in which Spiller has any ownership

interest; and (c) describe in detail Spiller's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.   For ten (10) years after entry of the Stipulated Order, Spiller must submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days of any change in the following:

1.   Spiller must report any change in: (a) any designated point of contact; or (b) the structure of any business that Spiller has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under the Stipulated Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, affiliate, or Person that engages in any acts or practices subject to the Stipulated Order; and

2.   Spiller must report any change in: (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which Spiller performs services, whether as an employee or otherwise, and any entity in which Spiller has any ownership interest, and identify the name, physical address, and any internet address of the business or entity.

XVI. **Recordkeeping.** Spiller and his companies (including any subsidiaries or affiliates) or any business in which Spiller is a majority owner or controls directly or indirectly, must create the following records for ten (10) years after entry of the Order, and retain each such record for five (5) years:

    A.    Accounting records showing the revenues from all goods or services sold, Lead Generation, Telemarketing, or Telephony Services;

    B.    Records of all contracts, service agreements, invoices, and sales agreements with each Customer, client, supplier, or vendor, including, without limitation, any Communications related thereto;

    E.    Records of reviews of Customers, terminations of Customers, and denials of service to prospective Customers, including documentation of the review process, procedures, implementation, status, and outcome, as described in the section of the Stipulated Order, entitled "Customer Review and Termination";

    G.    All call detail records for any Customer engaged in Telemarketing and/or initiating or generating Robocalls and all such call detail records must be retained for at least four (4) years;

    H.    Records of all provisioning and/or assigning of telephone numbers, including the dates provisioned or assigned to Spiller and/or his companies (including any subsidiaries or affiliates) and the dates such party provisioned or assigned to third parties;

14

I.    All records related to Section VII, including, without limitation, any Communications related thereto; or

J.    All records reasonably necessary to demonstrate full compliance with each provision of the Stipulated Order, including all submissions to the Plaintiffs.

**B.    The Defendant's Continuing Conduct**

### Overview

Notwithstanding the entry of the Stipulated Order, Spiller continued to facilitate illegal Robocalls across the U.S. telephone network after the Stipulated Order was entered. He has engaged in conduct which violates numerous provisions of this Court's permanent injunction, in addition to other violations of the Court's Order. Because Spiller has engaged in these practices while actively attempting to use alias names and spurious business entities to intentionally cloak his identity from law enforcement, it has been difficult to know the full scope of Defendant's continued violations. Nevertheless, Plaintiffs are aware that from at least September 2022 through sometime in December 2023, Spiller owned, operated, consulted for, and/or managed at least two companies that provided voice-over-internet-protocol ("VoIP") telephony services that initiated or facilitated illegal Robocalls.

Through the course of other investigations, several Plaintiffs discovered that Harold Speight ("Speight") owned an entity named Every1 Telecom. Based on discovery provided by Spiller in this matter, Plaintiffs were aware Speight was Spiller's stepfather at the time

the Stipulated Order was entered. *See* Ex. 1 (Moneck Skype Chat) at SKYPE016381[5] ("where [sic] still working on removing Mikel as CEO and replacing him with my stepfather Harold Speight").

After Plaintiffs settled this case with all Defendants, Plaintiffs began to investigate Every1 Telecom related to its apparent facilitation of illegal robocalls. Plaintiffs sent civil investigative demands to Bank of America, PayPal, and the Industry Traceback Group ("ITG") to request information on Spiller. Further, Plaintiffs requested or gathered records from the FCC, the Wyoming Secretary of State, the Alaska Secretary of State, and the Texas Secretary of State.

Through an analysis of these documents, it became clear that Spiller was violating the Stipulated Order. Further, Plaintiffs discovered that Spiller created two other VoIP Providers, at least one of which he used to violate this Court's Stipulated Order.

### Spiller's Finances

Spiller has not paid any of the $50,000 in civil penalties that was directed by this Court to be paid on or before twelve months following the Court's Entry of the Order. Ex. 2 (Tonya J. Heltzer Affidavit) at 1-2.  This failure to pay includes Spiller's failure to pay the $10,000 that was directed by this Court to be paid 30 days following the entry of the Stipulated Order. Ex 3 (John C. Spiller depo) at 106:17-24.

During a January 24, 2024 deposition with Plaintiff States, Spiller claimed his personal Wells Fargo bank account had an account balance of "[n]egative $249. 240-

---

[5] In his Skype chats, Spiller's username is "onlywebleads".

something dollars*." Id*. at 42:5-7; 47:12-15. Spiller testified during the deposition that he did not have a PayPal account. *Id*. at 46:2-3. However, Spiller has multiple PayPal accounts. Ex. 4 (John Isaac's Declaration) at ¶¶ 8-14.  Spiller also has a Zelle account and has used it before. Ex. 3 at 69:18-23.

Spiller stated that his monthly and weekly spending was "zero dollars," and that he was staying with his mother and stepfather, Speight, who "pay for everything right now." *Id*. at 50:15-25. Spiller claimed his parents paid his cell phone bill. *Id*. at 51:3-6. Spiller testified that his parents paid for an Uber for him to attend the deposition because he did not own or have access to a vehicle. *Id*. at 51:18-23. In contrast, during his January 31, 2024 deposition with the Plaintiff States, Speight testified that he did not pay for an Uber for Spiller when he attended Plaintiffs' deposition. Ex. 5 (Harold Speight depo) at 37:6-15. When asked what the most expensive thing he had purchased in the last three months, Spiller answered: "A bottle of water." Ex. 3 at 52:2-5.

Speight loaned Defendant Spiller $3,000 in September of 2023 without a payment plan but with the expectation that Spiller would pay Speight back. Ex. 5 at 35:15-36:20.

As noted above, Spiller testified he did not own or lease a car. Ex. 3 at 48:4-7. However, Speight testified that Spiller owns a truck (Ford F-150). Ex. 5 at 33:6-7; 33:18-19. Further, Maggie Casanova ("Casanova") owns a Mercedes. *Id.* at 34:7-10. According to Spiller, Casanova and Spiller are engaged. Ex. 3 at 13:7-11.

Spiller stated his occupation at the time of the deposition was that he was selling "SMS for Chris Hall." *Id*. at 28:19-22. Spiller said he had a contract between himself and Victory Telecom, a company Chris Hall owns. *Id*. at 30:23-31:5. Defendant Spiller testified

that he had not closed any deals, as that he only signed up to make sales at the end of December 2023 or beginning of January 2024. *Id*. at 30:5-20.  Regarding his arrangement with Victory Telecom, Spiller claimed he would "get an ownership split, so . . . when I make a sale, Chris Hall gets one-third of the profit. Victory—or Trent gets one-third and John Spiller gets one-third . . . of the profit . . . for the SMS I sell." *Id*. at 57:5-18. Spiller testified that, at the time of the deposition, he was no longer providing VoIP services in the USA. *Id*. at 46:10-24.

**Spiller and Speight**

At the time of the deposition, Spiller said he lived in Houston and Austin. *Id*. at 11:7-13.  At the Austin address, Spiller lived with his mother and Speight. *Id*. at 11:17-19. Spiller had been living at Speight's home since September 2023. Ex. 5 at 28:19-21. At the Houston address, Spiller lived with Casanova. Ex. 3 at 12:6-8.

Spiller first showed Speight the Stipulated Order in the beginning of January 2024. Ex. 5 at 41:14-21, 42:7-20.

**Aliases**

By July 20, 2021, Spiller had begun using the alias "John Caldwell,." and in at least one case, he wrote to Jay Kordic ("Kordic") that he was "John Caldwell"[6]  Ex. 6 (Jay Kordic Skype Chat) at SKYPE006329.

Spiller has gone by the aliases John Caldwell and John Casanova. Ex. 3 at 13:17-23. He went by these aliases for business, "[b]ecause, in the sales industry, when you're in

---

[6] Spiller's full name is John Caldwell Spiller, II. Ex. 3 at 11:2-4.

telecom, . . . they have a really sharp memory and they could remember when you say John Spiller, they can easily type in Google John Spiller, and what comes up is the FCC lawsuit and robo dialing." *Id.* at 130:6-22. This included having a PayPal account under the name John Caldwell, and it was used to pay Every1 Telecom vendors. *Id.* at 75:7-25.

Speight also confirmed that Spiller used an alias: "Because his name was crabbed in the business, and it would be hard to get clients to visit with him." Ex. 5 at 92:14-25.

### Every1 Telecom

In September of 2022, Harold Speight purchased Every1 Telecom from Steve Emory. *Id.* at 66:12-13. Speight was dependent on others to run all aspects of Every1 Telecom. The suggestion that Speight should run Every1 Telecom came from Spiller and Casanova. *Id.* at 59:12-23. Spiller then introduced Speight to everyone Speight needed to run the company. *Id.* at 59:24-25.

Spiller and his girlfriend/fiancée, Casanova, approached Speight with the idea of purchasing Every1 Telecom and encouraged him to do so *Id.* at 59:12-23. Spiller introduced Speight to Allan Noorda ("Noorda"). *Id.* at 59:24-25. Noorda's position at Every1 Telecom was said to be that of a compliance officer.[7] Speight, 60:23-61:1. Noorda introduced Speight to Andy Jones ("Jones"), who was Every1 Telecom's network operations center or "NOC." *Id.* at 66:22-67:4. In early 2023, Kordic replaced Noorda's role at Every1 Telecom. *Id.* at 69:13-21.

---

[7] Spiller did not provide a copy of the Stipulated Order to Noorda. Ex. 3 at 110:24-111:1.

Spiller knew Noorda as early as October 7, 2020. Ex. 7 (Noorda Skype Chat) at SKYPE003283. Spiller knew Jay Kordic as early as June 28, 2021, when Spiller was with Great Choice Telecom LLC, a company that was started during the pendency of this litigation. Ex. 6 at SKYPE006327. Spiller had known Jones for several years. Ex. 3 at 137:10-22.

Before purchasing Every1 Telecom at Spiller and Casanova's encouragement and direction, Speight did not any have experience in working with or running a VoIP or in any telephony-related business, and Speight was not formally trained in running a VoIP or in the telecommunications industry in any way. Ex. 5 at 16:14-15. Speight's knowledge of the telecom industry in general was exceedingly limited; for instance, Speight did not know what the term "Internet Protocol" meant. *Id.* at 47:2-6. Further, Speight did not have a working knowledge of how the STIR/SHAKEN call authentication framework operates in the ecosystem. *Id.* at 52:12-53:20. Speight also did not know how a "switch" worked, which was an integral part of how the business of Every1 Telecom operated. *Id.* at 58:7-8. Further, Speight could not recall some of Every1 Telecom's largest clients. *See Id.* at 131:18-132:1.

Every1 Telecom's documents, including contracts, technical documentation, and documents required for filing with the FCC, were drafted by Noorda. *Id.* at 153:1-13. Every1 Telecom's pricing was determined by Noorda and Kordic. *Id.* at 153:23-154:3. The calls per second, calls per sessions, and/or call volume Every1 Telecom allowed for each customer was determined by Noorda and Kordic. *Id.* at 154:8-19.

When it was necessary to discuss a potential customer's call traffic, Spiller would discuss it with Noorda, rather than with Speight. *Id.* at 86:8-10.

According to Speight, Spiller "[g]enerated sales leads, sales leads would come in and [Allan Noorda] . . . then Jay Kordic would vet the leads and get them onto our switch." *Id.* at 67:11-12. Spiller was paid "20 percent of the net from that company as long as it ran." *Id.* at 67:17-19. Spiller's girlfriend/fiancée Casanova kept track of the 20 percent of net that was to be paid to Spiller. *Id.* at 67:20-21. Spiller would also assist Jones with the switch. *Id.* at 68:1-3.

Spiller testified: "I found clients for Every1 Telecom" and "I would give them the name of the client" and "Jay Kordic and Alan Noorda would vet the client, make sure the client was all up to date, and they would either add them onto their switch or they will not." Ex. 3 at 65:17-66:2.

For the clients that Spiller acquired for Every1 Telecom, Spiller did not create "Know Your Customer" ("KYC") records reflecting any due diligence Spiller performed to verify the authenticity and legitimacy of the customer and its business, despite Spiller's claims that he allegedly screened the customers. *Id.* at 101:3-22. Spiller also did not provide these prospective clients a copy of the Stipulated Order. *Id.* at 102:10-13. Spiller did not create or keep records of the clients he referred to Every1 Telecom. *Id.* at 116:5-25. Spiller did not keep any business records. *Id.* at 116:9-11.

Casanova was Every1 Telecom's accountant. *Id.* at 138:8-11. Casanova was also in charge of making payments to vendors. Ex. 5 at 72:20-24. As one of the payment method options, Every1 Telecom would accept payments from customers through Casanova's

PayPal account. *Id.* at 82:1-7. Casanova had authorization to make payments for Every1 Telecom. *Id.* at 89:5-20. Casanova prepared the taxes and 1099s for the company. *Id.* at 90:8-11. Casanova, on behalf of Every1 Telecom, issued 1099s to herself and to Spiller. *Id.* at 56:11-20.

Speight never vetted any of the customers. *Id.* at 75:4-6. Speight never sought out any of the vendors with which Every1 Telecom worked. *Id.* at 76:16-17. Every1 Telecom's customer vetting was done outside of Every1 Telecom's email system. *Id.* at 81:1-12. Speight did not have access to these emails. *Id.* at 81:18-19. Further, he never looked at those emails. *Id.* at 90:5-7. Every1 Telecom did not have a company-wide record retention policy. *Id.* at 163:18-20.  There was no written agreement for Kordic to keep KYC-related or other customer documents. *Id.* at 162:25-163:8. Further, Speight did not know if Kordic still had the customer records in his possession. *Id.* at 163:7-8.

Roughly two-thirds of Every1 Telecom's clients were identified and referred by Spiller. *Id.* at 75:22-25. This included clients who purchased telephone numbers from Every1 Telecom. 85:9-17. The other third of the clients came from Noorda and/or Kordic. *Id.* at 77:3-6.

 In total, Speight was compensated $3,500 for running Every1 Telecom. *Id.* at 93:20-25. However, not including his expansive corporate card usage on personal items, Spiller was compensated "approximately $20,000 for the year," *Id.* at 94:1-3, and Casanova was compensated around $28,000 to $30,000. *Id.* at 94:8-10. Additionally, while Casanova was paid hourly, she was not required to submit a time sheet. *Id.* at 161:7-18. Further, Casanova made payments to herself out of the corporate account. *Id.* at 161:11-18. Noorda

was compensated approximately $12,000. *Id.* at 94:5-7. Jones was compensated approximately $18,000. *Id.* at 94:11-12.

### Every1 Telecom's Tracebacks

Every1 Telecom was identified by USTelecom's Industry Traceback Group[8] ("ITG") as being associated with at least 104 tracebacks from October 5, 2022 to December 21, 2023. Ex. 3 at ¶ 16. A traceback is a network-based process that seeks out the source of suspicious traffic.[9]  Beginning at a terminating voice service provider, a call is systematically traced from one voice service provider to the preceding voice service provider networks until a non-cooperative voice service provider and/or the originating voice service provider or originating customer is identified.[10]  According to the ITG, a robocall campaign is defined as a group of calls with identical or nearly identical messaging as determined by the content and calling patterns of the caller.[11] A single campaign often represents hundreds of thousands or millions of calls.[12]

Every1 Telecom was involved in many campaigns, including: Amazon-AuthorizeOrder, Amazon-AuthorizeOrder-P3, Amazon-Various-P1, Authorized-Order, Authorized-Order-P1, CBP-GovtImpers-P2, CCIRR-P3FinancialImpers, Debt-Elimination-P1, Discount-Avail50%, Financial-Impers-4, Grandparentscam,

---

[8] On July 27, 2020, the FCC selected the USTelecom-led Industry Traceback Group as the single registered consortium to conduct private-led traceback efforts, and has renewed is selection of the ITG in this role since that time.  Established in 2015, the ITG is a private collaborative industry group—composed of providers across wireline, wireless, VOIP, and cable services—that traces and identifies the sources of illegal robocalls.

[9] *USTelecom, Industry Traceback Group Policies and Procedures*, at 5 (revised April 2022) (ITG Policies & Procedures), *available at* https://tracebacks.org/itg-policies-and-procedures/.

[10] *Id.*

[11] *Id.* at 4.

[12] *Id.* at 4.

HomeServices-CleanEnergy-P4,          Impersonation-Fraud-P1,          MedicalServices-

FreeAlertSystem-P1, SSA-Impers-P1, StudentLoan-Payments-P1, Travel-Brand-Impers,

Utility-30MinDisconnect, and Verizon-Impers-P1. Ex. 4 at ¶ 16.

Given the number of tracebacks involving Every1 Telecom and the fact that a traced

call campaign is representative of potentially at least tens of thousands or even millions of

suspected illegal robocalls, Spiller's continued facilitation of suspected illegal robocalls is

subjecting consumers in the Plaintiff States, as well as across the country, to an

astronomical volume of suspected illegal robocalls.

There were at least 54 Tracebacks for calls placed to telephone numbers on the

National Do Not Call Registry. *Id.* at ¶ 20.

According to the ITG, Every1 Telecom delivered prerecorded messages, such as:

- For a prerecorded Amazon scam call: "Hello, this is Amazon, this call is to

    authorize a payment of $999.00.  We would like to inform you that there is

    an order place for Apple iPhone 11 Pro using your Amazon account.  If you

    do not authorize this order press 1 or press 2 to authorize this order." *Id.* at ¶

    18.

- For a prerecorded debt elimination call: "Hello this is Jacob from Discover

    Credit Card department.  Discover estimates some big changes on your

    credit card accounts and you are now eligible for a complete debt

    elimination on all of your credit cards.  This is a limited time offer, to get

    yourself enrolled please press 1 to speak to a live representative now." *Id.* at

    ¶ 19.

On March 8, 2023, an email was sent from hp@every1telecom.com to ITG, and at the bottom of the email, it read: "Sent from my Verizon, Samsung Galaxy smartphone." Ex. 8 (Every1 Telecom emails to ITG) at #513299.2.[13] Spiller—not Speight—had a Samsung Galaxy phone. Ex. 5 at 117:22-24; Ex. 3 at 27:2. Speight did not send this email.[14] Ex. 5 at 118:16-20.

Typically, Speight would sign his emails:

> Harold 'HP' Speight
> President
> Every1 Telecom
> O 855.4Every1 (855-438-3791)
> E hp@every1telecom.com
> W www.every1telecom.com

Ex. 5 at 116:2-6, Ex. 8 at #513299.1.

Spiller had access to the email accounts for support@every1telecom.com and hp@every1telecom.com (Speight's account). Ex. 5 at 79:14-23. Spiller also had access to Speight's business email from the beginning of Speight's work at Every1 Telecom. *Id.* at 79:22-23.

---

[13] The email states: "So your [sic] telling us that we can go to our Client and tell them to say the name of the client that is paying for these calls within the first few seconds then the Tracebacks will stop?" Ex. 8 at #514220.1

[14] Speight is an Apple and AT&T user. Ex. 5 at 117:8-21.

On March 8, 2023, hp@every1telecom.com emailed the ITG:

[email]=to:Industry Traceback Group(support+id8794@industrytracebackgroup.zendesk.com);from:HP
Speight(hp@every1.telecom.com)

2023-03-08T21:55:15

We have already removed all these traceback offenders since the beginning of the year and we have implemented Veriswitch's beta stage AI fraud functionality system to sit on my switch and that will screen calls then will block all Ips that are sending fraud/scam traffic then that will be able to show to the state AGs and to the FCC and to you guys that we mean business and are putting our money where our mouth is at.

This is the last week we are getting tracebacks.

Harold Speight

Ex. 8 at #513299.3. Speight testified that the email above was not written by him, that it lacks his "HP" signature, and it did not look familiar. Ex. 5 at 172:12-20.

Spiller had access to ITG's traceback portal to report and respond to Traceback notices. *Id.* at 90:12-14. Spiller has logged into Every1 Telecom's ITG Traceback account. Ex. 3 at 137:7-12. Spiller claimed: "[Speight] gave me one time the e-mail address and the password when he first set it up. . . . [S]o that I can help the [noc] . . . find access to the information in the switch." *Id.* at 137:8-12.

Speight never used Spiller's computer to "access the business" or access the Traceback portal. *Id.* at 139:21-140:6.

### Every1 Telecom's Bank Account

Spiller had access to the Every1 Telecom bank accounts (Bank of America and Wells Fargo).[15] Ex. 5 at 38:14-39:6. Casanova was another authorized signer to the Wells Fargo account. *Id.* at 46:9-11.

Spiller used the Every1 Telecom login credentials to access the bank account online. Ex. 3 at 66:10-24. He had access to Every1 Telecom's accounts until December of 2023. *Id.* at 67:13015.

Speight did not recall making many purchases with the corporate card. *See* Ex. 5 at 128:13-22; 129:11-19; 130:9-24.  In the past year, Speight had not traveled to Chicago. *Id.* at 26:2-5. Further, Speight did not regularly visit Houston in 2023. *Id.* at 90:18-20. When he did, it was not for business. *Id.* at 90:24-91:12. Nonetheless, there were purchases on the corporate card for trips to these locations. Ex. 4 at ¶ 6.

There were also unauthorized purchases of United airplane tickets, $837 at Clark's in Austin, $708.95 at Agape Diamonds, and a thousand-dollar purchase at Men's Warehouse. Ex. 5 at 136:8-20; 137:4-9; 137:13-16. On May 16, 2023, there was an unauthorized payment of $500 to Mercedes Benz of Austin for when Casanova's car died in front of Speight's home. *Id.* at 135:5-24.

Speight testified that he did not know about the tens of thousands of dollars spent at Social Wholesale, a vape wholesaler. Ex. 5 at 132:5-25; Ex. 4 at ¶ 6.  In total, Every1

---

[15] At the time of this filing, Plaintiffs do not have records for the Wells Fargo accounts.

Telecom, unbeknownst to Speight, spent a total of $40,000 at Social Wholesale alone. Ex. 4 at ¶ 6.

Spiller used the Every1 Telecom bank account to make payments to or through his personal PayPal account. *Id.* at ¶¶ 11, 14. Speight did not know and did not authorize Spiller's use of the corporate bank account to pay for Spiller's personal PayPal account and/or PayPal purchases. Ex. 5 at 127:5-13. Casanova was the only other person who could have authorized corporate payments to Spiller's personal PayPal account. *Id.* at 127:14-15.

Further, Speight testified: "I am under the realization that there were things going on here that I had no idea was transacting. And I would not have condoned this if I were aware of it." *Id.* at 134:18-19. According to Speight's counsel at the time of the deposition, Speight's "come to realize that he's been taken advantage of in numerous ways. And so he's pretty upset right now." *Id.* at 136:1-3.

### Every1 Telecom's Customers

Every1 Telecom provided its customers with VoIP services and "venues for Tier 1, Tier 2 traffic." *Id.* at 64:2-13. Some portion of Every1 Telecom's traffic was telemarketing. *Id.* at 65:8-10.

One of Spiller's customers was Talk to the World LLC, and they "sell solar [panels] and they also sell health insurance." Ex. 3 at 70:5-22. Talk to the World LLC did outbound telemarketing and had a call center. *Id.* at 70:23-71:2. Another client, Network Authority LLC and Simon Booth, did telemarketing and made outbound telephone sales calls. *Id.* at 72:23-73:10.

Regarding some customers, Spiller stated that, in February 2023: "I was getting calls from [Speight] and Andy about it telling me that my client – the clients I referred to them were all scam and fraud. . . [T]hey were whole sellers and had a bunch of scam and fraud traffic on their routes." *Id.* at 150:21-151:2. By his own admission, Spiller referred these customers to Every1 Telecom even though he knew they were "bad apples." *Id.* at 151:3-14.

For at least one client at Every1 Telecom, Spiller and Every1 Telecom purposefully rerouted the telecom traffic to go to "honeypots." *Id.* at 154:19-155:14. He did this "[b]ecause I didn't want the traffic ending into America." *Id.* at 154:22-25.

## Every1 Telecom Closes

Every1 Telecom allegedly became inactive in December of 2023. Ex. 5 at 24:8-11. According to Spiller, he stopped working with Every1 Telecom on December 1, 2023. Ex. 3 at 32:5-12.

Speight testified to the following:

```
 9      Q.    Okay.  And in reflecting on some of the questions and
10   answers you provided today, I think you alluded to this a
11   little earlier, do you feel as though, you know, John may have
12   taken advantage of you so that he could continue operating this
13   VoIP?
14      A.   I would say that I have had revelations today of
15   things that I was not aware of, yes.
16      Q.   And do you feel -- in looking back on some of the
17   things we've -- we've talked about today in terms of who made
18   what decisions and who controlled what, do you feel as though
19   John played a role in controlling this business?
20      A.   I would say that I have been taken advantage of and I
21   realize that.
22      Q.   Do you believe that he had a role in controlling the
23   business or managing the business?
24      A.   Yes, I do.
```

Ex. 5 at 167:9-24.

## VoIP4All

On July 31, 2023, Spiller opened VoIP4ALL LLC ("VoIP4All") as an Alaska LLC. Ex. 4 at ¶¶ 24, 25. He used the Every1 Telecom corporate card to pay the Alaska Department of Commerce for VoIP4All's registration. *Id.* Further, he used Speight's home address as VoIP4All's mailing address. *Id.* Spiller made a filing in CORES for VoIP4All,

using Speight's name and address. *Id.* at ¶ 27. In the Robocall Mitigation Database, Spiller

created a filing for VoIP4All using Speight's name. *Id.* at ¶ 28.

The Alaska Department of Commerce provided Plaintiffs with the below

information regarding Spiller's registration:

> Payment Initiated Date: 2023-07-31 10:50:36 AM AKDT
> Payment Completed Date: 2023-07-31 10:53:30 AM AKDT
> Record Number: 10240997
> Applicant Name: Voip4ALL LLC
> Payer IP Address: 73.32.182.81
> Payer Name: John Spiller
> Payer Email: hp@every1telecom.com
> Payer Phone: 832-954-6452
> Payer Address: 11234 E Travelers Way Cir, Houston, TX 77065
> Card Number: XXXXXX4474
> Card Type: Mastercard
> Card Expiration Date: 04/2028
> Receipt Number: 100593587
> Amount Charged: $250

Ex. 4 at ¶ 25.

Speight did not know about VoIP4All. Ex. 5 at 138:11-18. Speight did not know of

or authorize Spiller using Speight's home address as VoIP4All's corporate address for

VoIP4All's Secretary of State filing. *Id.* at 138:19-23. Speight did not authorize Spiller

using Speight's name and address on VoIP4All's CORES filings. *Id.* at 139:6-24. Speight

did not authorize Spiller using Speight's name and address on VoIP4All's RMD filing. *Id.*

at 140:18-141:1. Further, Speight did not e-sign VoIP4All's RMD filing on August 26,

2023, although the declaration accompanying that form provides: "I declare (or certify,

verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."[16] *Id.* at 141:16-18.

Before being handed a copy of the Alaska Secretary of State filing, Spiller testified that VoIP4All was not his company, and "[i]t wasn't going to be – I mean, I don't know whose company it was. I never actually set it up." Ex. 3 at 171:5-8.

Later in the deposition, Spiller changed his testimony about Voip4All, saying: "Yeah, I was thinking about setting up my own VoIP company because I wanted to see if I can take a jab at the VoIP industry." *Id.* at 173:3-6.

Spiller filed VoIP4All's CORES filing using Speight's name, without Speight's knowledge. *Id.* at 178:1-7. Spiller filled out VoIP4All's RMD filing, using Speight's name, and Spiller signed it for Speight, without Speight's knowledge. *Id.* at 174:11:17; 175:6-17.

Spiller did not notify the Plaintiffs about the creation of VoIP4All in contravention of the Stipulated Order. Spiller, 173:14-18. Spiller claimed VoIP4All has never been operational. *Id.* at 177:24-25.

### ATX Telco LLC

In October 2023, Spiller submitted a certificate of formation filing to the Texas Secretary of State's Office to create ATX Telco LLC ("ATX Telco"), as a limited liability company. Ex. 4 at ¶ 29. On October 20, 2023, Spiller amended ATX Telco to make Speight the CEO and President of the company. *Id.* at ¶ 30. Spiller made an FCC CORES filing for

---

[16]          FCC's          Robocall          Mitigation          Database, https://fccprod.servicenowservices.com/rmd?id=rmd_form&table=x_g_fmc_rmd_roboca ll_mitigation_database&sys_id=5f72f67a1bdcbd10e4ec848ce54bcb4a&view=sp   (entry for Voip4all) (last visited Mar. 20, 2024)

ATX Telco, listing Speight as the contact person and address. *Id.* at ¶ 31. Spiller made an FCC 499 filing for ATX Telco, listing Speight as the CEO of the company. *Id.* at ¶ 32.

In his deposition, Speight originally testified that ATX Telco was a business created by a person Speight did not know, but it was where former Every1 Telecom clients could go to continue their business. Ex. 5 at 143:1-14. Spiller was the person giving the former Every1 Telecom clients this information. *Id.* at 143:7-11.

Speight did not have any relationship with ATX Telco, and Speight was not the owner of ATX Telco. *Id.* at 143:15-19. Speight testified that he did not know of and did not authorize Spiller's use of Speight's information on ATX Telco's Secretary of State filings. *Id.* at 144:10-23; 146:4-6, 13-15. Speight did not know of and did not authorize Spiller's use of Speight's information on ATX Telco's CORES filings. *Id.* at 146:20-147:7. Speight did not know of and did not authorize Spiller's use of Speight's information on ATX Telco's RMD filing. *Id.* at 147:19-148:20.

Spiller filed ATX Telco's CORES filing, using Speight as the contact without Speight's knowledge. Ex. 3 at 182:24-183:7; 184:6-7. Spiller used Every1 Telecom's phone number as ATX Telco's contact phone number. *Id.* at 184:1-3. Spiller filed ATX Telco's 499 filing, using Speight as the contact without Speight's knowledge. *Id.* at 185:5-11. Spiller filed ATX Telco's RMD filing using the name Richard Scott, a name that Spiller said he just made up. *Id.* at 186:7-19. Originally, Spiller had filed it in Speight's name, without Speight's knowledge. *Id.* at 186:25-10.

Spiller testified that Speight knew Spiller was setting up ATX Telco. *Id.* at 179:22-24. Spiller stated: "I was afraid to put it my name, because of everything I've had with the

FCC and y'all guys." *Id.* at 179:24-180:25. Speight was not involved with ATX Telco. *Id.* at 180:9-11.

ATX Telco LLC did not have a monitoring policy or procedure. *Id.* at 100:16-20. ATX Telco did not file for a STIR/SHAKEN token. *Id.* at 145:6-9. ATX Telco used Every1 Telecom's STIR/SHAKEN token, despite Every1 Telecom being defunct. Ex. 4 at ¶¶ 36, 37.

Spiller did not notify Plaintiffs that Spiller created ATX Telco LLC. Ex. 3 at 115:15-18.

Before being shown any documents, Spiller testified:

```
20        Q.    Okay.  Has ATX Telco ever sent VoIP data?

21        A.    I'm not for certain.

22        Q.    Okay.  It's your company though, correct?

23        A.    Yes, it is.

24        Q.    And you don't know what your company's

25  been up to?
```

Integrity Legal Support Solutions
www.integritylegal.support

John Spiller, II – 1/24/2024

114

```
1         A.    No, I do not.
```

*Id.* at 113:20-114:1.

34

After being shown the different ATX Telco documents and asked if ATX Telco ever sent VoIP traffic, Spiller responded: "Now that I come to think of it, yes, sir. We did turn on just for about – I think it was in December we turned on for a week. And, in that week, I got like six or seven [Tracebacks], so I had to shut it off." *Id.* at 189:3-9. Spiller's client that sent this traffic was Telecom Business Network. *Id.* at 189:12-13.

Regarding why he started ATX Telco, Spiller stated: "I was hurting for money. So I wanted to make something so I could try to make some money." *Id.* at 189:1-2.

### ATX Telco's Customers and Tracebacks

ATX Telco was identified by ITG as being associated with at least seven (7) tracebacks from December 5, 2023 to December 14, 2023. Ex. 3 at ¶ 34.

ATX Telco was involved in these campaigns: Amazon-Various-P1, StudentLoan-GraduateSupport, and StudentLoan-GraduateSupport-P1. *Id.*

According to the ITG, ATX Telco delivered prerecorded messages, such as:

- For a prerecorded Amazon scam call: "Hi this is Amazon customer support. We have seen a recent order which is billed on your card attached to your Amazon account. The amount charged is $1,499.00. We noticed some suspicious activities on your account so we have put on hold to this transaction. Please press 1 to speak with our customer representative thank you." *Id.* at ¶ 38.

On December 5, 2023, the ITG notified Admin@atxtelco.com of the Traceback. Ex. 9 (ITG email notice to ATX Telco) at #514007.1. The Traceback notice concerned "[c]alls to consumers impersonating Amazon for fraudulent means."[17] Ex. 9 at #514007.1.

On December 12, 2023, the ITG notified ATX Telco of four more Tracebacks. *See* Ex. 10 (ITG Notices to ATX Telco, Dec, 12). On December 14, 2023, the ITG notified ATX Telco of two more Tracebacks. *See* Ex. 11 (ITG Notices to ATX Telco, Dec, 14). The notices stated the calls were: "Prerecorded calls offering student financial support programs, such as income-driven programs." Exs. 10, 11. And that the basis for the Tracebacks were: "Evidence of lack of consent for prerecorded message – high volume," "Evidence of lack of consent for prerecorded message – called party confirmation," and "Failure to provide opt-out mechanism."[18] Exs. 10, 11.

The client for these Tracebacks was Telecom Business Network, a former Every1 Telecom client. Ex. 4 at ¶¶ 35-36. Spiller attested to the calls with an A-Level attestation with Every1 Telecom's STIR/SHAKEN token. *Id.*

Spiller was on notice of these Tracebacks. *See* Ex. 3 at 194:6-16; 195:14-20. Spiller did not respond to these Tracebacks as John Spiller, but instead responded to the ITG as if he was his stepfather, Speight. *Id.* at 194:15-16.

---

[17] The recording of this call can be found here: https://portal.tracebacks.org/api/public/attachments/1406163.
[18] The recordings of these calls can be found here: https://portal.tracebacks.org/api/public/attachments/1407199; https://portal.tracebacks.org/api/public/attachments/1407829; https://portal.tracebacks.org/api/public/attachments/1407831; https://portal.tracebacks.org/api/public/attachments/1407834; https://portal.tracebacks.org/api/public/attachments/1407840; and https://portal.tracebacks.org/api/public/attachments/1407850.

Spiller or his company did not sign a contract with Telecom Business Network. *Id.* at 191:3-5. Spiller did not provide Telecom Business Network with the Stipulated Order. *Id.* at 191:12-14.

Telecom Business Network sent telemarketing calls. *Id.* at 190:22-25. ATX Telco received Tracebacks regarding Telecom Business Network's calls. *Id.* at 194:1-19.

ATX Telco never had a bank account. *Id.* at 196:24-197:1. ATX Telco's clients either paid Spiller directly or sent payments to Every1 Telecom. *Id.* at 197:2-9. Speight did not know about the payments to Every1 Telecom's Wells Fargo bank account. *Id.* at 197:9-13. According to Spiller, he did not have access to the Every1 Telecom Wells Fargo bank account, and he "just had to ask [Speight] to send me money when I needed it." *Id.* at 197:14-17.

### IP Addresses

As highlighted above, the Alaska Department of Commerce provided Plaintiffs Spiller's IP address when he paid for the VoIP4All's registration: "Payer IP Address: 73.32.182.81." Ex. 4 at ¶ 25.

The IP address 73.32.182.81 was used to log in to Bank of America with the user IDs "johnspiller," and "every1telecom" *Id.* at ¶ 7. The user ID "every1telecom" had 1,892 activity logs associated with the IP address 73.32.182.81. *Id.* The IP address 73.32.182.81 had at least 159 active logs related to a PayPal account for "John Caldwell." *Id.* at ¶ 10.

The IP address 73.32.182.81 had at least 17 activity logs for Every1 Telecom with ITG's provider portal. *Id.* at ¶ 15.

## Other Stipulated Order Violations

According to Spiller, at the deposition, he claimed that did not read over the Stipulated Order thoroughly. Ex. 3 at 25:14-18 ("I just took y'all's word for it that y'all guys were going to do me a solid, not going to jam me up, but in actuality, I should have read that injunction sooner.") From the States' perspective, Spiller was being untruthful when he said this, as the States spent many hours talking through the terms of, and answering all of his questions about, the Stipulated Order on multiple occasions with Spiller.

Spiller claims to have deleted all of his Skype messages in December 2023. *Id.* at 46:10-15; 46:25-47:6.

While claiming that he dissolved Rising Eagle Group Cayman, Spiller did not have proof he dissolved it. *Id.* at 104:24-105:19.

Spiller did not notify Plaintiffs that Spiller had moved from Houston to Austin. *Id.* at 115:9-11.

In his deposition, Spiller testified:

- that he had not sent a robocall or assisted and facilitated in the sending of robocalls since the Stipulated Order was entered. *Id.* at 90:9-23.

- that he has not engaged in telemarketing or assisted and facilitated other people telemarketing since the Stipulated Order was entered. *Id.* at 91:24-92:4.

- that he has not called people on the National Do Not Call Registry or assisted and facilitated other people making calls to people on the

National Do Not Call Registry since the Stipulated Order was entered. *Id.* at 93:23-94:20.

- that he never assisted and facilitated anyone to circumvent STIR/SHAKEN. *Id.* at 97:4-8.

Spiller's actions directly contradict these statements. Records reviewed from the call surveillance system RRAPTOR[19] showed that March 1, 2023, and March 13, 2024, Every1 Telecom signed over 2,000 calls that were recorded by RRAPTOR. Ex. 4 at ¶ 39. Many of these calls were to telephone numbers on the National Do Not Call Register. *Id.* at ¶ 40.

### Belated Compliance Report

On February 9, 2024, Spiller sent Plaintiffs, via email, a Compliance Report. Ex 12 (Spiller Signed Compliance Report) at 1. Spiller wrote: "In 2023 I started two businesses which are done with now: Voip4all and ATX Telco. . . ." *Id.* at 2. Spiller also wrote: "Further I started and falsified that Harold Speight was the owner of Voip4all and ATX Telco." *Id.* at 3. Spiller continued: "I wasn't in compliance with the stipulated order. I have admitted this as much in our deposition and have told you guys this in our last phone call earlier this morning 2.9.2024 . . ." *Id.* at 3.

For Every1 Telecom, Spiller wrote: "I brought in USA clients and USA vendors into Every1 Telecom. I also helped Andy with understanding how to operate Veriswitch

---

[19] *See What is RRAPTOR?*, ZIPDX, https://legalcallsonly.org/what-is-rraptor/ (last visited Mar. 27, 2024) ("RRAPTOR sits patiently and waits for calls. When the phone rings, the RRAPTOR robot answers and interacts with the caller (usually a robocaller robot, but sometimes a person). RRAPTOR records the conversation and transcribes what the caller said. If a telecom provider signed the call using the STIR/SHAKEN protocol, RRAPTOR captures that signature as well.")

better and more timely." *Id.* at 4. Spiller also provided that he "helped my stepfather Harold Speight understand a deeper understanding of telecom industry." *Id.* at 2.

For Voip4All, Spiller wrote: "I have already admitted to you in a previous question that I falsified that Harold Speight was the owner of this company but that was a misrepresentation. Further the company never got off the ground. I was the controlling party and the actual owner." *Id.* at 4.

For ATX Telco, Spiller stated: "I am the sole owner of this company for SMS only. Will not be selling any USA voip services for as long as I live. I only sell SMS." *Id.* at 4.

Further, "all emails have been disengaged now so their isn't anymore information to give you guys on these two companies I either try to start or did start last year. They have all been dissolved." *Id.* at 2. "I started ATX Telco thinking that I could run my own clean USA voice telecom company but it failed miserable. We got 6 tracebacks in the first 2 weeks of starting up so I turned it off. Its pointless to begin work in USA telecom with my track record. . ." *Id.*

Finally, Spiller claimed: "Im officially out of USA Voip. No more hearing my name at all." *Id.* at 2.

## IV.   DISCUSSION

This Court has the inherent power to enforce compliance with its order through civil contempt. *In re Bradley*, 588 F.3d 254, 265 (5th Cir. 2009). Plaintiff States, as parties to the case, may invoke the power of the Court by filing this motion. *Gompers v. Buck's Stove & Range Co*., 221 U.S. 418, 445-46, 31 S. Ct. 492, 499-500, 55 L. Ed. 797 (1911). Civil contempt may be used to compel compliance with a court order and may be imposed on a

defendant following notice and an opportunity to be heard. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827, 114 S. Ct. 2552, 2557, 129 L. Ed. 2d 642 (1994). A finding for civil contempt is warranted here because there is clear and convincing evidence that Spiller has violated this Court's order. *United States v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th Cir. 2004). Spiller should be held in contempt because he is bound by the permanent injunction issued by this Court and has continued to violate its provisions.

Plaintiffs contend Spiller was, at a minimum, the was a beneficial owner of Every1 Telecom where he and his girlfriend/fiancée, Casanova, earned the most profit from the company. Ex. 5 at 94:1-10. In many portions of the Stipulated Order, Spiller and any business that where he is the majority owner or controls directly or indirectly is required to do or not do something. While Speight was the owner of Every1 Telecom on paper, Spiller controlled many aspects of the business:

- He recruited two-thirds of the clients. Ex. 5 at 75:22-25.

- He had control of and used the corporate bank account. Ex. 5 at 38:14-39:6.

- He used the corporate bank account for personal purchases. *See* Ex. 5 at 136:8-20; 137:4-9; 137:13-16.

- He communicated as Every1 Telecom to the ITG. Ex. 5 at 172:12-20; Ex. 3 at 137:7-12.

- He had access to Speight's emails. Ex. 5 at 79:14-23.

For this Motion to Show Cause, Plaintiffs argue that, at a minimum, he directly or indirectly controlled Every1 Telecom. Thus, Spiller is responsible for Every1 Telecom's violations of the Stipulate Order.

**A.      The Permanent Injunction Binds Defendant.**

The Court's permanent injunction as set out in the Stipulated Order binds Spiller as he is a party to the case and he filed a joint motion with Plaintiff States requesting entry of the proposed Stipulated Order, the terms of which he agreed to, evidenced by his signature on the proposed order. ECF No. 220 at 45. Additionally, on March 6, 2023, Counsel for the State of Indiana sent an email to Spiller attaching a copy of the Stipulated Order entered by the Court.[20] Ex. 13 (3.26.2023 Email to Spiller) at 1. While Spiller did not specifically respond to the email which attached his Stipulated Order, Spiller communicated with Plaintiffs' counsel using that same email address on numerous occasions prior to and after the entry of the Stipulated Order, including as recently as February 9, 2024. Ex. 14 (2.9.2024 Email from Spiller) at 1. While Spiller never responded to the email regarding his Stipulated Order, Spiller has responded to several emails since the entry of the order. Therefore, Spiller is bound by the permanent injunction. Fed. R. Civ. P. (65)(d)(2)(A).

**B.      Defendant Has Violated the Permanent Injunction and Other Orders of the Court Governing Business Operations**

Spiller has violated the Stipulated Order, and he has done so flagrantly. He has violated:

- Section I: Permanent Ban on Robocalls

- Section II: Permanent Ban on Telemarketing

---

[20] Spiller has argued that Plaintiffs never provided him a copy of the Appendix to the Stipulated Order. On February 10, 2023, Counsel for the State of Indiana sent Spiller the filed, but not entered, Stipulated Order. Ex. 15 (2.10.2023 Email to Spiller) at 1. This email included the index. *Id.*

- Section IV: Ban on Certain Calls

- Section V: Permanent Ban on Telephony Services

- Section VII: Network Monitoring

- Section VIII: Screening of Current and Prospective Customers

- Section X: Permanent Ban on Certain Business Relationships

- Section XI: Dissolution of the Corporate Entities

- Section XIII: Monetary Judgment

- Section XIV: Order Acknowledgments

- Section XV: Compliance Reporting

- Section XVI: Record Keeping

Despite being bound by the Stipulated Order, Spiller continued the same violative conduct he was sued for by the Plaintiff States and the FCC.

## Section I

Spiller has engaged in acts or practices which violate the permanent ban on Robocalls, as that term is defined in the Order. Section I of the Stipulated Order enjoins Spiller from Assisting or Facilitating others in initiating, any Outbound Telephone Call that plays or delivers a Robocall, unless Spiller proves that such prerecorded message was delivered for the purpose of compliance with 16 C.F.R. § 310.4(b)(4)(iii), as amended.

Despite testifying that he had not made a Robocall and had not assisted and facilitated in the sending of Robocalls since the Stipulated Order was entered (Ex. 3 at

90:9-23), there are examples of Spiller's clients sending Robocalls using Every1 Telecom and ATX Telco. Ex. 4 at ¶¶ 35-36. Spiller was on notice of these Robocalls. Ex. 12 at 4.

Spiller bears the burden of proving consent. *See Gene & Gene, LLC v. BioPay. LLC*, 541 F.3d 318, 327 (5th Cir. 2008); *see also In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C.R. 559, 564 (2008). If Spiller fails to provide proof that he has received consent in this proceeding, it should likewise be presumed that all calls were made without the recipients' consent. If it were not for Spiller, these callers would not have used Every1 Telecom or ATX Telco to initiate Robocalls. Spiller assisted and facilitated these Robocalls being initiated, in violation of the Stipulated Order.

## Section II

Spiller has engaged in acts or practices which violate the permanent ban on Telemarketing, as that term is defined in the Order. Section II of the Stipulated Order enjoins Spiller from Assisting and Facilitating others to engage in, Telemarketing, whether acting directly or through an intermediary, including by consulting, brokering, planning, investing, or advising.

According to Speight, some portion of Every1 Telecom's traffic was telemarketing. Ex. 5 at 65:8-10. Several of Spiller's clients made calls that sold solar panels, health insurance, and other telemarketing. Ex. 3 at 70:5-71:2; 72:23-73:10. Further, he was on notice of the content of his client's Telemarketing calls. *See* Ex. 12 at 4.

If it were not for Spiller, these callers would not have used Every1 Telecom or ATX Telco to initiate Telemarketing calls. Spiller assisted and facilitated these Telemarketing being initiated, in violation of the Stipulated Order.

**Section IV**

Spiller has engaged in acts or practices which violate the permanent ban on calls to numbers on National Do Not Call Registry or equivalent state lists or calls that display a caller ID number that the calling party does not have the legal authority to use. Section IV of the Stipulated Order enjoins Spiller Assisting and Facilitating others to engage in initiating, causing the initiation of, or transmitting any telephone calls that are placed to telephone numbers on the DNC Registry or any state equivalent thereof.

Spiller's company ATX Telco transmitted telephone calls to telephone numbers on the National Do Not Call Registry. Ex. 4 at ¶ 40. Every1 Telecom transmitted telephone calls to telephone numbers on the National Do Not Call Registry. *Id.* at ¶ 20. If it were not for Spiller, these callers would not have used Every1 Telecom or ATX Telco to initiate these telephone calls to phone numbers on the National Do Not Call Registry. Spiller assisted and facilitated these calls being initiated, in violation of the Stipulated Order.

**Section V**

Spiller has engaged in acts or practices which violate the permanent ban on the provision of Telephony services without having ongoing automated procedures in place to block certain types of calls. Section V of the Stipulated Order enjoins Spiller from engaging in, or Assisting and Facilitating others to engage in, providing Telephony services, as those terms are defined in the Order, without having ongoing automated procedures in place to block telephone calls potentially illegal calls including but not limited to: calls that not

authenticated through the STIR/SHAKEN Authentication Framework,[21] are Robocalls and include any language related to or purportedly related to insurance.

Spiller used Every1 Telecom's STIR/SHAKEN certificate to sign ATX Telco's calls. Ex. 4 at ¶ 36.  ATX Telco did not file for a STIR/SHAKEN token. Ex. 3 at 145:6-9. Thus, ATX Telco's calls were not authenticated through the STIR/SHAKEN Authentication Framework. Further, Spiller had at least one client who made calls selling "health insurance." Ex. 3 at 70:5-22. These calls were in violation of the Stipulated Order. If it were not for Spiller, these callers would not have used Every1 Telecom or ATX Telco to initiate these telephone calls in violation of STIR/SHAKEN and telephone calls selling insurance. Spiller assisted and facilitated these calls being initiated, in violation of the Stipulated Order.

## Section VII

Section VII of the Stipulated Order requires that Spiller, when engaging in Telephony Services, to implement and maintain constant, up-to-date written policies, practices, and procedures monitoring, reviewing, and analyzing call traffic to identify, mitigate, and block illegal Robocalls or patterns consistent therewith, including, without limitation, the consideration of call duration, call volume, calls per second, the source or legality of caller ID numbers, the location of the calls' origination or U.S. point of entry, etc.

---

[21] As defined in the Stipulated Order, SITR/SHAKEN means the Secure Telephone Identity Revisited and Signature-based Handling of Asserted Information Using Tokens standards. *See* 47 U.S.C. § 227b.

ATX Telco did not have a monitoring policy or procedure. Ex. 3 at 100:16-20. This was in violation of the Stipulated Order.

## Section VIII

Spiller has engaged in acts or practices which violate the permanent ban on engaging in, or Assisting and Facilitating other to engage in, providing Telephony Services to any Customer, or new or prospective Customer, without first engaging in a reasonable screening of that Customer. Section VIII of the Stipulated Order enjoins Spiller providing services to a new or prospective Customer without having done this screening.

At Every1 Telecom, Spiller did not perform any due diligence or screen the customers. *Id.* at 65:17-66:2; 67:11-12. Further, Speight did not vet any of the customers. Ex. 5 at 75:4-6. By not reasonably screening or conducting any due diligence of his customers, Spiller violated the Stipulated Order.

## Section X

Spiller has engaged in acts or practices which violate the permanent ban engaging in certain business relationships. Section X of the Stipulated Order enjoins Spiller from engaging in, or Assisting and Facilitating others to engage in, entering into or continuing any business relationship, including, without limitation, consulting services, with a customer that is likely engaging in conduct prohibited in Sections I, II, III, IV, or V of the Stipulated Order. For purposes of the Stipulated Order, a "Customer" is defined as any person that provides Telephony Services from Spiller, individually or through any agents, employees, affiliates, subsidiaries, corporations, or other business formations.

47

One of Spiller's Customers, Telecom Business Network, was a Customer of Every1 Telecom before it was a Customer of ATX Telco. Ex. 4 at ¶¶ 35-36. Spiller either knew or reasonably should have known that Telecom Business Network would engage in the any conduct prohibited in Sections I, II, III, IV, or V of the Stipulated Order. Spiller knew Telecom Business Network sent Telemarketing calls. Ex. 3 at 190:22-25. Spiller had received notice of Telecom Business Network's violative calls. *Id.* at 194:1-19.

By engaging with Customers that Spiller knew or should have reasonably known would engage in the any conduct prohibited in Sections I, II, III, IV, or V of the Stipulated Order (and did in fact engage in said conduct), Spiller violated the Stipulated Order.

## Section XI

Section XI of the Stipulated Order requires that Spiller formally dissolve Rising Eagle Capital Group LLC, JSquared Telecom LLC, and Rising Eagle Capital Group-Cayman within sixty (60) days of the entry of the Stipulated Order. Further, Spiller is required to provide Plaintiffs with documentation of the required dissolution no later than thirty (30) days after completion.

While claiming that he dissolved Rising Eagle Group Cayman, Spiller did not have proof he dissolved it. Ex. 3 at 104:24-105:19. Further, Spiller has not provided documentation of the dissolution of Rising Eagle Capital Group LLC and JSquared Telecom LLC. By not providing documentation of the dissolutions (and not actually dissolving Rising Eagle Capital Group LLC and JSquared Telecom LLC), Spiller is in violation of the Stipulated Order.

**Section XIII**

Section XIII of the Stipulated Order requires that Spiller pay Plaintiffs the amount of $50,000 in civil penalties on or before twelve months following the Court's entry of the Stipulated Order, of which $10,000 shall be due 30 days following the Court's entry of the Stipulated Order. As of March 22, 2024, Spiller has not made any monetary payments to Plaintiffs. Ex. 2 at 1-2.

**Section XIV**

Section XIV of the Stipulated Order requires Spiller to deliver a copy of the Stipulated Order to a variety of different people or entities, including, but not limited to:

- For any business he owns or controls directly or indirectly, all principals, officers, directors, and LLC managers and members, and all employees, agents, and representatives with managerial responsibilities for conduct related to the subject matter of the Stipulated Order; and

- For any business he owns or controls directly or indirectly, all new Customers and existing Customers.

Further, Spiller is required to document the delivery of the Stipulated Order. Spiller is also required to deliver the Stipulated Order either before entering into new agreements, before starting new responsibilities, or within a certain number of days.

With regards to Every1 Telecom, Spiller delivered the Stipulated Order to Speight after Every1 Telecom had closed. Ex. 5 at 41:14-21, 42:7-20. Spiller also never delivered the Stipulated Order to any of the customers he brought to Every1 Telecom. Ex. 3 at 116:5-

25. For ATX Telco, Spiller did not deliver a copy of the Stipulated Order to Telecom Business Network. Ex. 3 at 191:12-14.

The call traffic of these customers, facilitated by ATX Telco and Every1 Telecom, was violative of several sections of the Stipulated Order. If Spiller had delivered the Stipulated Order, perhaps Spiller would not have violated as many of the sections of the Stipulated Order as he did. Instead, Spiller violated the Stipulated Order by not delivering the Stipulated Order to the applicable parties.

### Section XV

Section XV of the Stipulated Order requires that Spiller submit timely compliance reports to the Plaintiffs. Specifically, Spiller must notify Plaintiffs of a change in the structure of any business that Spiller has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under the Stipulated Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, affiliate, or Person that engages in any acts or practices subject to the Stipulated Order. Spiller must do so within fourteen (14) days.

Spiller did not notify the Plaintiffs about the creation of VoIP4All. Ex. 3 at 173:14-18. Spiller did not notify Plaintiffs that Spiller created ATX Telco LLC. *Id.* at 115:15-18. Instead of notifying Plaintiffs, Spiller knowingly falsified business records to hide that he owned VoIP4All and ATX Telco LLC. Further, Plaintiffs contend that Spiller controlled Every1 Telecom, and he took steps to hide his involvement with Every1 Telecom. Spiller only admitted his role in these businesses when confronted with documents in Plaintiffs' deposition. *Id.* at 189:3-9.

By not notifying Plaintiffs about the existence of, and his role with, Every1 Telecom, as well as VoIP4All and ATX Telco, Spiller violated the Stipulated Order.

## Section XVI

Section XIV of the Stipulated Order requires that Spiller create and maintain records, including but not limited to, contracts, call detail records, invoices, and Communications.[22]

Regarding Every1 Telecom, Spiller did not keep any business records. Ex. 3 at 116:9-11. He also did not create or keep records of the clients he sent Every1 Telecom. *Id.* at 116:5-25. For ATX Telco, Spiller did not have a contract with one customer, and he did not have a corporate bank account. *Id.* at 191:3-14. Further, Spiller deleted all of his Skype messages in December 2023. *Id.* at 46:10-15; 46:25-47:6. Also, Spiller wrote in his compliance report, regarding VoIP4All and ATX Telco: "all emails have been disengaged now so their isn't anymore information to give you guys on these two companies I either try to start or did start last year." Ex. 12 at 2.

By not creating and maintaining certain business records, Spiller violated the Stipulated Order. By violating this specific section, Plaintiffs are unable to assess the scope of Spiller's continued violations.

## Overall

Overall, Spiller violated most sections of the Stipulated Order. He did so purposefully.

---

[22] Section VIII also requires Spiller to create and maintain Know Your Customer records. Spiller did not create these records for Every1 Telecom Customers he was responsible for. Ex. 3 at 101:3-22.

Many of the provisions of the Stipulated Order were meant to mitigate potentially problematic behavior and/or require Spiller to keep proof of his compliance with the Stipulated Order. Instead of complying with the Stipulated Order, Spiller hid his Robocalling operation from the world by falsifying business records and going by aliases, and he convinced his stepfather to run a VoIP that Spiller controlled from the shadows.

### C.    Defendant Has Violated Further Orders of the Court

Courts may impose sanctions on a party for failing to comply with their orders. *VSP Labs, Inc. v. Hillair Capital Inv., L.P.*, 26 F.4th 245, 255-56 (5th Cir. 2022) (bankruptcy court could impose sanctions for failure to comply with its Lift Stay Orders); *Goldman v. Trustcomm, Inc.*, 661 Fed. Appx. 835, 841 (5th Cir. 2016) (bankruptcy court had jurisdiction to impose sanctions for violation of preliminary injunction); *Donohue v. Zhenyin Wang*, 2023 U.S. Dist. LEXIS 193024, 4 (WD Tex. Oct. 27, 2023) (court has "inherent power to enforce compliance with their lawful orders through civil contempt") (citation omitted); *United States v. Price*, 2023 U.S. Dist. LEXIS 103964, *8 (ED Tex. June 14, 2023) (contempt order for failing to comply with subpoena).

The Court's permanent injunction prohibits Spiller is in clear violation of the Court's Orders and should be held in Contempt.

### D.    The Court May Hold the Defendant in Civil Contempt Based on the Record if He Fails to Raise a Genuine Issue for Hearing.

If the Court finds there are no material disputes of fact presented by the written record based on the documentary evidence and by defendant's own admissions in that record, the Court may dispense with holding an unnecessary hearing and proceed to

sanction the defendant. *Morales-Feliciano v. Parole Bd. of Com. of Puerto Rico*, 887 F.2d 1, 6 (1st Cir. 1989).  However, if the Court deems it necessary, Plaintiff States request that the Court conduct a hearing on Plaintiffs' Motion.

## V.    CONCLUSION

THEREFORE, Plaintiff States respectfully request that an order be issued requiring Spiller to show cause why he should not be adjudged in contempt of this Honorable Court.

Respectfully submitted,

**FOR THE STATE OF ARKANSAS:**

TIM GRIFFIN
Attorney General for the State of Arkansas

*/s/ Amanda Wentz*
AMANDA WENTZ
Ark. Bar No. 2021066
Amanda.Wentz@ArkansasAG.gov
Assistant Attorneys General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-1178

*Counsel for Plaintiff*
*STATE OF ARKANSAS*

**FOR THE STATE OF INDIANA:**

TODD ROKITA
Attorney General for the State of Indiana

*/s/ Joseph D. Yeoman*
DOUGLAS S. SWETNAM
Indiana Bar No. 15860-49
douglas.swetnam@atg.in.gov
JOSEPH D. YEOMAN
Indiana Bar No. 35668-29
Joseph.Yeoman@atg.in.gov
Deputy Attorneys General
302 West Washington Street
IGCS – 5th Floor
Indianapolis, IN 46204
(317) 232-6294 (Swetnam)
(317) 234-1912 (Yeoman)
(317) 232-7979 (Fax)

*Counsel for Plaintiff*
*STATE OF INDIANA*

**FOR THE STATE OF MICHIGAN:**

DANA NESSEL
Attorney General for the State of Michigan

*/s/ Kathy Fitzgerald*
KATHY FITZGERALD
Michigan State Bar No. P31454
fitzgeraldk@michigan.gov
SCOTT MERTENS
Michigan State Bar No. P60069
Mertenss@michigan.gov
MICHAEL S. HILL
Michigan State Bar No. P73084
HillM19@michigan.gov
Assistant Attorneys General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

*Counsel for Plaintiff*
*STATE OF MICHIGAN*

**FOR THE STATE OF MISSOURI:**

ANDREW BAILEY
Attorney General for the State of Missouri

*/s/ Michelle L. Hinkl*
MICHELLE L. HINKL
Missouri State Bar No. 64494
Michelle.Hinkl@ago.mo.gov
Assistant Attorney General
Attorney General's Office
P.O. Box 861
St. Louis, MO 63188
Telephone: (314) 340-7961
Facsimile: (314) 340-7981

*Counsel for Plaintiff*
*STATE OF MISSOURI*

**FOR THE STATE OF NORTH CAROLINA:**

JOSHUA H. STEIN
Attorney General for the State of North Carolina

*/s/ Tracy Nayer*
TRACY NAYER
North Carolina State Bar No. 36964
tnayer@ncdoj.gov
Special Deputy Attorney General
North Carolina Department of Justice
Consumer Protection Division
P.O. Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050

*Counsel for Plaintiff*
*STATE OF NORTH CAROLINA*

**FOR THE STATE OF NORTH DAKOTA:**

DREW H. WRIGLEY
Attorney General for the State of North Dakota

*/s/ Christopher G. Lindblad*
CHRISTOPHER G. LINDBLAD
North Dakota State Bar No. 06480
clindblad@nd.gov
*(Pro Hac Vice Application Pending / Forthcoming)*
Assistant Attorney General
Consumer Protection & Antitrust Division
Office of the Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone: (701) 328-5570
Facsimile: (701) 328-5568

*Counsel for Plaintiff*
*STATE OF NORTH DAKOTA*

**FOR THE STATE OF OHIO:**

DAVE YOST
Attorney General for the State of Ohio

*/s/ Erin B. Leahy*
ERIN B. LEAHY
Ohio Bar No. 69509
W. TRAVIS GARRISON
Ohio Bar No. 76757
Assistant Attorneys General
Ohio Attorney General's Office
Consumer Protection Section
30 E. Broad Street, 14th Floor
Columbus, Ohio 43215
(614) 752-4730 (Leahy)
(614) 728-1172 (Garrison)
Erin.Leahy@OhioAttorneyGeneral.gov
Travis.Garrison@OhioAttorneyGeneral.
gov

*Counsel for Plaintiff*
*STATE OF OHIO*

**FOR THE STATE OF TEXAS:**

KEN PAXTON
Attorney General for the State of Texas

*/s/ David G. Shatto*
DAVID SHATTO
Fed. Bar No: 3725697
Texas Bar No: 24104114
C. BRAD SCHUELKE
Texas Bar No. 24008000
Brad.schuelke@oag.texas.gov
KAYLIE BUETTNER
Fed. Bar No: 3748037
Texas Bar No. 24109082
Kaylie.Buettner@oag.texas.gov
Assistant Attorneys General
Office of the Attorney General
P.O. Box 12548 (MC-010)
Austin, Texas 78711
Telephone: (512) 463-2100
Facsimile: (512) 473-8301

*Counsel for Plaintiff*
*STATE OF TEXAS*

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for Plaintiffs attempted to confer with John C. Spiller, II. On February 9, 2024, Plaintiffs had a call with Defendant Spiller, and during the call, Plaintiffs notified Defendant Spiller that Plaintiffs would be filing for contempt of court. On March 27, 2024 at 11:25 AM Central, Plaintiffs emailed Defendant Spiller to confer regarding the motions. On March 28, 2024 at 7:24 AM Central, Plaintiffs emailed Defendant Spiller to confer regarding the motions. On March 28, 2024 at 8:07 AM Central, undersigned counsel called and left a voicemail with Defendant Spiller regarding the motions. On March 28, 2024 at 8:08 AM Central, Plaintiffs emailed Defendant Spiller to confer regarding the motions. Plaintiffs have not heard from Defendant Spiller since February 9, 2024.

/s/ *Joseph Yeoman*
Joseph Yeoman

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that a true and correct copy of the above and foregoing document has been served using the CM/ECF system to all counsel and parties of record. I also certify that a true and correct copy of the above and foregoing document has been served via email and U.S. mail to John C. Spiller II.

<u>/s/ *Joseph Yeoman*</u>
Joseph Yeoman